Billy R. WHITE, Plaintiff,

v.

ED MILLER & SONS, INC., Defendant.

No. CIV. 76-0-399.

United States District Court,
D. Nebraska.

Aug. 2, 1978.

On Request For Attorney Fees Sept.
20, 1978.

Benjamin Wall, Wall & Wintroub, Omaha, Neb., for plaintiff.

Randall W. Owens, Young, White, Ramsey, Wieland & Owens, Omaha, Neb., for defendant.

SCHATZ, District Judge.

Plaintiff, Billy Ray White, brought this suit pursuant to 42 U.S.C. §§ 1981 and 2000e, et seq., alleging that he was discharged from employment by the defendant as a result of racial discrimination. The matter was tried to the court sitting without a jury. This memorandum opinion shall constitute the court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The plaintiff, who is black, was employed by defendant as an engineer on a dredge being used on a construction project at the Eppley Airfield near Omaha, Nebraska. Having previously worked for defendant in a different capacity, plaintiff was referred to the job through his union's hiring hall on or about April 14, 1975. Plaintiff's duties at the job included lubricating the various engines, pumps, etc., on the dredge, keeping the dredge clean, assisting in the addition of pipe to the dredge and performing any tasks assigned by the person in charge of the dredge, known as a stickman or leverman.

Over the weekend of May 31—June 1, 1975, two mechanics checking the dredge and changing the oil in the engines discovered that there was no grease in one of the auxiliary pumps. Although they added lubricant, the pump broke down two days later. Plaintiff was discharged by the defendant the same day. Neither the engineer on the night shift nor the mechanics who checked the dredge on weekends were terminated. These employees are white.

Title VII of the Civil Rights Act of 1964 prohibits the discharge of "any individual" because of "such individual's race," § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1).

*McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 278, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976).[1]

Title 42, United States Code, Section 1981, also provides a federal remedy for discrimination in private employment on the basis of race. *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

■ To prevail on either claim, plaintiff must demonstrate that his discharge was based on race, *i. e.,* that he adequately performed his job but was replaced by another person of a different race, or that he was singled out for discharge while others who were similarly situated, but of a different race, were retained. If the defendant can articulate a legitimate non-discriminatory reason for plaintiff's discharge, plaintiff must show that the stated reason is merely pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The dredging operation at which plaintiff was employed was undertaken to relocate the Missouri River levee, thus permitting certain runways at Eppley Airfield to be extended. The dredge consisted of a floating platform or hull containing various engines and pumps which removed material from the river bed and transferred it to the shore. Duties on the dredge were divided between a stickman or leverman, who controlled the operation of the dredge, and an engineer who saw to lubrication, maintenance, fueling, etc. These same two positions were filled on both the day and the night shift. By custom in the trade, most major changes in operation such as relocating the dredge, adding pipe, and major maintenance work, were done during the day shift if practical, since working conditions were better and additional support personnel available. However, these operations could be done at night if necessary.

This litigation has focused on the proper care of the dredge. Defendant claims to have terminated plaintiff for failure to adequately lubricate the pumps on the dredge and for failure to keep the dredge clean and shipshape. Plaintiff, pointing out that all other employees connected with the dredge were white, contends that he alone was singled out for blame when a problem occurred although others were equally responsible. Plaintiff also suggests that complaints about his general job performance have been resurrected and distorted as an afterthought in an attempt to bolster the defendant's case.

The evidence indicates that when plaintiff began working for defendant, there was some disagreement as to whether a second person was needed on the dredge with the leverman and, if so, what his job classification should be. This dispute between the employer and the union focused on the plaintiff, who was the only engineer working on the dredge at that time. However, the issue was whether any engineer was required, not whether plaintiff individually was qualified to serve in that position. The issue was ultimately resolved in favor of a second person remaining on the crew with the status of engineer, and when a second shift was added, it, too, consisted of a leverman and an engineer.

■ It also appears that some discussions were held between plaintiff and the job supervisors regarding the manner in which plaintiff performed his job, particularly with regard to whether he was spending too much time off the dredge on the river bank and whether he kept the dredge properly cleaned. No formal complaints were ever filed with the union regarding these matters. From all the evidence, and particularly from the testimony of Mr. Robert Holman, the leverman on the day crew, this court concludes that these complaints were not sufficiently serious to dictate a ruling that plaintiff did not satisfactorily perform his job in general. With respect to the question of whether plaintiff was satisfying the normal requirements of his work,

1. Plaintiff has exhausted the administrative procedures available under Title VII to seek redress for alleged discrimination and has received his statutory "right to sue" letter. This court, therefore, has subject matter jurisdiction over plaintiff's Title VII claim. *Greene v. Carter Carburetor Co.,* 532 F.2d 125 (8th Cir. 1976).

The plaintiff need not show perfect performance or even average performance . . .. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him.

*Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977).

Maintaining proper lubrication of the dredge was an important ongoing duty of the engineers on both shifts, day and night, and to some extent of the mechanics employed by defendant. The major mechanical components of the dredge consisted of three large internal combustion engines operating a main pump and two auxiliary pumps and supplying electricity to the dredge, and a hydraulic pressure system for moving the various pipes, braces, etc. All of these items required some combination of grease and oil to be maintained at appropriate levels in order to reduce friction of moving parts and to prevent breakdowns. A large wall chart on the dredge indicated the appropriate time intervals for checking lubrication levels, making oil changes, and greasing. Some fittings had to be greased as frequently as every twelve hours, some as infrequently as every five hundred hours or longer, and others at various intervals in between. As most intermittent lubrication, *i. e.*, greasing less frequently than once every twelve or twenty-four hours, was ordinarily done while the dredge was shut down during the daytime for other reasons, most of this work was performed by plaintiff. The engineer on the night shift was to do what greasing was necessary for his shift and to check other parts as needed. The engine oil was changed and the pumps checked on weekends by Mr. Louis Prescott, a mechanic employed by defendant.

While Mr. Prescott was changing the engine oil on the dredge the Saturday before plaintiff was terminated, Mr. Anderson, the chief mechanic employed by defendant, checked the pumps. These two individuals discovered one of the auxiliary pumps needed grease. Mr. Prescott testified that he observed a seal on the pump appeared to be leaking grease and that the pump could have gone dry in as little as two hours or it could have been leaking for as long as three or four days before becoming dry. He also testified that if run without lubrication, the pump could fail in less than twenty hours of operation.

The auxiliary pump was greased on Saturday. The following Tuesday some breakdown occurred which necessitated repairs to the pump. Defendant would have the court infer that the breakdown resulted solely from a lack of lubrication although there is no direct evidence of such a causal relationship. Defendant also contends that plaintiff as the engineer on the day shift was primarily responsible for seeing to the lubrication of this particular pump, and that failure to do so with resulting damage justifies his discharge. This contention, if supported by the evidence, would constitute a nondiscriminatory reason for discharge sufficient to rebut plaintiff's charge of discrimination. *Compare Flowers v. Crouch-Walker Corp., supra.*

■ However, the evidence does not support the conclusion that plaintiff alone was responsible for the pump being dry or for its breakdown. It is equally reasonable to conclude from Mr. Prescott's testimony that the pump might have gone dry during the night shift the Friday before it was discovered (although Stanley Borst, the engineer on the night shift, testified that he experienced no particular problems that night). As indicated, there is no evidence that the pump failed because of a lack of lubrication. Plaintiff testified that too much grease in the pump could also cause it to fail. Or the failure could have resulted from any of a variety of causes unrelated to lubrication. There is no indication that the engineers were told on Monday to watch the pump for signs of trouble or that any was expected as a result of the discovery the previous Saturday. While the evidence does suggest that greasing the pump was to be done by the engineers on the day shift in most instances, it is also clear that such greasing could be done and in some instances had to be

done during the night shift. Mr. Borst testified that he did not concern himself with the pump because plaintiff, while training him, said not to worry about it. He also testified that his leverman, Mr. Chapman, pointed out this particular pump to him. All the witnesses agreed that any machine leaking grease or oil, as was the pump in question, needed special attention. In view of these unexplained possibilities, assigning all of the blame for the problems with the pump on plaintiff, while absolving the others connected with its lubrication of any blame, is wholly unreasonable under the circumstances. It appears that such assignment of blame was the result of an unconstitutional and impermissibly fickle finger pointed at plaintiff and plaintiff alone.

Ed Miller, Jr., the vice president in charge of operations for the defendant at the time of the incident, testified that he was told on Monday, June 2, 1975, that the pump had been found to need greasing. On Tuesday, he learned that breakdown had occurred in mid-morning, that it was not "a real serious problem . . . but it was a major breakdown." He, therefore, decided to fire plaintiff and "secure the services of somebody that would take their job to interest." There is no indication that any such action, or even a less drastic measure such as a reprimand or notification of the problem, was considered or taken with regard to any other employee. The distinguishing characteristics when considering plaintiff and Stanley Borst were that one was black and worked the day shift while the other was white and worked the night shift. As indicated, the responsibility for the pump being dry could lie with either if he failed to observe the pump leaking and take corrective action. The distinguishing characteristics when considering plaintiff and Louis Prescott were that one was a black engineer and the other a white mechanic. Both were required to check the pump periodically and yet it was discovered to need additional lubrication. From the state of this record and taking into account these distinguishing characteristics, the court concludes that the determination to

fire plaintiff the day of the breakdown cannot be explained on any basis other than race since no action was taken or even considered against any other employee. Under the rationale set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the court finds that plaintiff has established that his discharge was the result of racial discrimination and that defendant has failed to establish a legitimate non-discriminatory reason for the disparate treatment of plaintiff. Therefore, plaintiff is entitled to a judgment in his favor.

There remains the question of the remedy to be awarded plaintiff. Title 42, United States Code, Section 2000e–5(g) provides in part:

> If the court finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate. . . . Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the backpay otherwise allowable.

[4] As the Eighth Circuit Court of Appeals observed in *Wells v. Meyer's Bakery*, 561 F.2d 1268 (8th Cir. 1977):

> The primary objectives of Title VII are to remove discriminatory employment barriers and "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). In order to fashion the most complete relief possible, Congress has granted the federal courts comprehensive remedial powers. Back pay is a fundamental remedy and should be denied only in extraordinary circumstances.

561 F.2d at 1272.

In the instant case an award of back pay is an appropriate form of relief to be granted to the plaintiff.

Plaintiff was terminated June 3, 1975. Dredging at the Eppley project continued until August 8, 1975, at which time the dredge was dismantled and shipped to a different project. Plaintiff would have the court infer from the fact that the new project was federally funded that if plaintiff had not been unlawfully discharged, he would have been requested to continue working for defendant at the new project in order to enable defendant to meet federal equal employment opportunity guidelines. However, there is no evidence in the record to suggest that plaintiff would not have been treated as was his white replacement, who was terminated at the completion of the Eppley project and who returned to the union hiring hall for future employment. There is no basis in this record for awarding any damages for any period beyond the end of the project on August 8, 1975.

Plaintiff, had he not been discharged, would have worked an additional thirty-six hours the week of June 2 to June 6, 1975, and sixty hours per week for the following nine weeks, culminating on August 8, 1975. At the hourly rates provided by the governing union contract, plaintiff would have received a total of $5,591.04 for this period. In fact, plaintiff did obtain other work with Eby Construction Company on another project the following Monday (June 9, 1975) where he remained until August 9, 1975. At that job he earned a total of $4,193.64. Offsetting plaintiff's actual earnings for the period prior to the completion of the Eppley project against the amount he would have received as wages from the defendant, as required by 42 U.S.C. § 2000e–5(g), *supra*, plaintiff is entitled to recover from defendant the amount of $677.40, plus costs and attorney fees for violation of Title VII of the Civil Rights Act of 1964.

The Supreme Court has recognized that 42 U.S.C. § 1981 provides a separate remedy for redress of racial discrimination. *Johnson v. Railway Express Agency, supra.* Consequently,

> An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages. . . .
> The remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent.

*Johnson v. Railway Express Agency*, 421 U.S. at 460–61, 95 S.Ct. at 1720, 1721 (1975).

Having determined that plaintiff is entitled to recover damages from defendant for race discrimination, the court will award plaintiff compensatory damages, not punitive, in the amount of $677.40 for violation of 42 U.S.C. § 1981.

Plaintiff has requested an award of reasonable attorney fees pursuant to 42 U.S.C. § 1988 and 2000e–5(k). Such an award is committed to the discretion of the court, although it has been held that attorney fees should be awarded the prevailing party absent unusual circumstances. See *Wharton v. Knefel*, 562 F.2d 550 (8th Cir. 1977); *International Society for Krishna Consciousness v. Andersen*, 569 F.2d 1027 (8th Cir. 1978). The court feels that this case is one in which the plaintiff is entitled to a reasonable attorney fee.

## ON REQUEST FOR ATTORNEY FEES

### MEMORANDUM OPINION

This matter comes on for hearing and disposition, post-trial, with reference to plaintiff's request for allowance of attorney fees. In that connection, such an allowance is provided under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k), which provides:

> In any action or proceeding under this subchapter, the court, in its discretion, may allow the prevailing party, other than the commission or the United States, a reasonable attorney's fee as part

of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

This court has previously concluded in its memorandum opinion of August 2, 1978, that plaintiff's counsel in this cause is entitled to a reasonable attorney fee.

In this type of case, the court invites and encourages counsel to arrive at a settlement as to the amount of an attorney fee. Such was done here. However, no settlement or agreement was forthcoming. Thereafter, a hearing was had at which time briefs and worksheets were introduced and filed in support of the recommendation of both sides as to the amount of the fee in question.

The court has carefully studied the respective positions of both sides in this case and has taken into consideration the following factors in arriving at a figure representing a fair, adequate and reasonable attorney fee:

1) The time and labor required;

2) The novelty and difficulty of the questions presented;

3) The preclusion of other employment by the attorney due to acceptance of the case;

4) The customary fee;

5) Whether the fee is fixed or contingent;

6) The amount involved and the results obtained;

7) The experience, reputation and ability of the attorney;

8) The nature and length of the professional relationship with the client;

9) Awards in similar cases;

10) The skill requisite to perform the legal service properly and the quality of the attorney's work.

See *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

Counsel for plaintiff has submitted along with his affidavit and request for fees a thorough and detailed time sheet involving the total hours spent on this case. These time sheets reflect slightly in excess of ninety-three (93) hours spent by counsel for plaintiff, slightly in excess of fourteen (14) hours spent by a partner of plaintiff's counsel, and slightly in excess of fifty-four (54) hours spent by law clerks employed by plaintiff's counsel. Counsel for defendant raises no objection concerning the accuracy of these time records. Furthermore, there is no question raised concerning the capability, efficiency and trial stature of plaintiff's counsel, and the court observes that counsel for both sides in this matter share the same reputation. The court, therefore, finds that the time sheet submitted by plaintiff's counsel is a fair reflection of the time spent on this case by him, and others in his office, and credits the total time accordingly.

Admittedly there was but a minimal recovery for the plaintiff in this case, but nevertheless under the spirit and intent of Title VII, *supra*, a reasonable and fair fee should be awarded to counsel for plaintiff and in this connection the court finds that the sole yardstick of a contingent fee is not an accurate representation of the work and legal efforts put forth by an attorney to unveil and correct employment practices which are not in compliance with Title VII, *supra*. It is true that the contingency factor is one that is to be taken into consideration but it would be unreasonable and it would not do to base an attorney's fee only and solely upon this factor and it should be noted that counsel for the defendant does not in any way urge the contingent fee factor alone be applied here.

Counsel for plaintiff has requested a fee in his affidavit (Filing No. 31) in the amount of a figure not less than $17,000 and not more than $27,000, plus taxable court costs expended. Other than the affidavit filed by plaintiff's counsel there is no further record made by expert testimony, or otherwise, to buttress counsel's request. Counsel for defendant argues that the award of attorney fees should reflect the

extent to which the plaintiff prevailed and in view of the fact that minimal relief was granted to plaintiff, the award should be much less than that requested by plaintiff. At the hearing on this subject, counsel for defendant suggested that the fee should be a figure of about $4,000.

■ Whereas an award of attorney fees in this type of case must be sufficient to make legal representation economically and financially attractive to qualified lawyers, the attorney fees must not be awarded as a substitute for damages and it will not do that the fees are punitive or awarded as a penalty against defendant, nor should the fees be a windfall for plaintiff's counsel. *See Lockheed Minority Solidarity Coalition v. Lockheed Missiles & Space Co., Inc.*, 406 F.Supp. 828 (D.C.Cal. 1976).

■ Based upon the entire record in this case, and based upon all factors which this court believes to be relevant, *supra*, which this court has carefully considered including, but not limited to, the amount of time expended by plaintiff's counsel, and including the trial period of four days, and including the fact that plaintiff's counsel, and others in his office, have worked on this case for a period of almost two years, the court finds that plaintiff should be awarded costs in this case, to include an attorney's fee, in the total amount of $5,500.00. The court has determined that this figure is fair and reasonable and adequate under all the circumstances and is not excessive or punitive in any respect.