644 F.2d 506
 27 Fair Empl.Prac.Cas. 652,
26 Empl. Prac. Dec. P 31,833
Phillip AQUAMINA, Plaintiff-Appellant,
v.
EASTERN AIRLINES, INC., a Delaware corporation, and
International Association of Machinists and
Aerospace Workers, District # 100, a
labor organization,
Defendants-Appellees.
 No. 79-3823
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Unit B
 May 8, 1981.
 Phillip Aquamina, pro se.
 Carmen L. Leon, Miami, Fla., for Eastern Airlines, Inc.
 Appeal from the United States District Court for the Southern District of Florida.
 Before RONEY, FRANK M. JOHNSON, Jr. and HENDERSON, Circuit Judges.
 HENDERSON, Circuit Judge.
 
 
 1
 Phillip Aquamina appeals the district court's grant of summary judgment in favor of the appellees Eastern Airlines, Inc. (Eastern) and International Association of Machinists and Aerospace Workers, District # 100 (District # 100) in this action for wrongful dismissal from employment on the basis of race.[1]
 
 
 2
 After considering the evidence filed with and in response to the appellees' motions for summary judgment, the trial court upheld the decision of the System Board of Adjustment (SBA or Board) that Aquamina's discharge was justified by his unauthorized absence from work[2] and an unsatisfactory work record.[3] The Board found no evidence that race was a factor in Aquamina's termination.[4] Furthermore, the district court concluded that Aquamina had been given a full and adequate SBA hearing at which he was ably represented[5] by a District # 100 staff representative. Thus, the district court held that there was no clear proof of a discriminatory, bad faith breach of the duty of fair representation by District # 100. See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Coe v. United Rubber, Cork, Linoleum and Plastic Workers of America, 571 F.2d 1349 (5th Cir. 1978).
 
 
 3
 Aquamina would have us draw an inference of discrimination from the fact that a white worker, Gerald R. Kincaid, who was charged with virtually the same offense committed on the same day in 1976[6] and represented by the same union staff member at the same hearing before the same panel, was disciplined with suspension only. We cannot attribute this disparate treatment to race.
 
 
 4
 As the SBA pointed out in its decision in Kincaid's case, his testimony was direct and made in apparent good faith. He stated that he had attempted to notify the supervisor that he had returned home briefly to check on his companion who had been injured in an automobile accident.[7] Kincaid had been employed by Eastern for nine years and the neutral SBA board member described him as an exemplary employee. Despite the fact that Kincaid had been temporarily terminated in 1973, there was no evidence of improper conduct since that restoration to duty.
 
 
 5
 Conversely, Aquamina's discharge was the culmination of a continuing record of work violations. Although in 1975 the discharge for a time card violation had been reduced to suspension, Aquamina's work conduct had been unsatisfactory for several years before and continued to be inadequate thereafter.[8] Aquamina's statement that he had received permission to leave the jobsite was directly refuted.[9] Finally, the deciding vote in the SBA decision to uphold Aquamina's discharge was that of the neutral board member.
 
 
 6
 The appellant fails to raise any issue of fact indicative of racially discriminatory conduct by Eastern. To prevail below as a matter of law, Aquamina had the burden of demonstrating that he was discharged on the basis of race and that any legitimate, nondiscriminatory reasons for discharge articulated by the employer were merely pretextual. White v. Ed Miller & Sons, Inc., 457 F.Supp. 148 (D.Neb.1978). Eastern's termination procedure was neutral in design and practice; it did not have the effect of screening out members of a protected group at a disproportionately higher rate. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Griggs Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). Because Aquamina could not have carried his burden with the facts he presented, Eastern was entitled to summary judgment. Similarly, there was no evidence that District # 100 wilfully failed to represent Aquamina fairly. Hence, the summary judgment in its favor must also be sustained.
 
 
 7
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Aquamina sought damages and injunctive relief under 42 U.S.C. § 2000e, 42 U.S.C. § 1981, 42 U.S.C. § 1988 and the First, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments to the Constitution. He contends that he was discriminatorily discharged by Eastern and that District # 100 wilfully failed to fairly represent him in the disciplinary hearings
 
 
 [2]
 On April 22, 1976, Aquamina was observed leaving the jobsite while on duty as a stock clerk. He was absent from 12:55 a. m. to 1:37 a. m. When challenged by his supervisors upon his return, Aquamina explained that it had become necessary for him to go home to check the condition of his two children for medical reasons. Apparently one child had a condition which could be aggravated by excessive heat created should storm windows have blown shut during earlier heavy rains. Aquamina was a divorcee and he had responsibility for the welfare of his children
 
 
 [3]
 The numerous entries on Aquamina's work offense record attest to the mediocrity of his performance. In his first two years of employment he was absent 623.6 hours of 4,040 hours due to illness, tardiness, personal business, injury, and unauthorized absence. This pattern continued and Aquamina was suspended several times for lack of attendance among other reasons. In 1975 he was discharged for punching another employee's workcard, however this penalty was ultimately reduced to a suspension following an SBA hearing. Appeals from several earlier suspensions which were brought by the union on behalf of Aquamina were still pending before the SBA. But, contrary to the appellant's contention, the Board expressly did not consider the appeals suspensions as part of the appellant's proven work offense record
 
 
 [4]
 According to Aquamina, his superior threatened him after his first reinstatement in 1975. In essence, the supervisor allegedly said that he would see that Aquamina lost his job, because Aquamina was the first employee that he had terminated who had ever been reinstated. This threat shows only that the appellant may have been the victim of some animosity in 1976; it fails to establish that the animosity was based on race
 
 
 [5]
 Subsequent to his dismissal, Aquamina conferred with his union representative on at least two occasions in the preparation of his case. The union, through its shop steward, aided Aquamina in investigating the incident and gathering witnesses and statements. Gerald R. Kincaid, the white worker who allegedly received favored treatment, was present because he was scheduled to testify for Aquamina and his case was to be heard at the same time. With the latter's permission, the cases were prepared for hearing at the same time by the same arbitrator
 At the hearing, the union representative cross-examined witnesses and raised objections to Eastern's evidence. At the end of the hearing, the appellant himself said he thought a good presentation had been made on his behalf. Furthermore, the same union representative was successful in having Aquamina's penalty reduced from discharge to suspension in 1975.
 
 
 [6]
 The departures were not related in anyway, however. Each man went to a different destination for a different purpose
 
 
 [7]
 The Board opinion states that the two testifying supervisors had been advised of the accident prior to Kincaid's April 22, 1976, absence and did not question its occurrence
 
 
 [8]
 See note 3 supra. The record reflects that Aquamina was under surveillance on April 22, 1976, because he had been reprimanded for an unauthorized absence just shortly before and instructed at the time that only a supervisor could grant permission to leave the base
 
 
 [9]
 Aquamina contended that he had received permission to leave from Kincaid, the lead man on the crew that evening. Kincaid's testimony concerning this episode was:
 Q: Did you feel you had authority to let him go?
 A: I'm not saying I let him go. I'm saying he told me he might have to go home during the night.
 Aquamina had been told that only a supervisor could give him permission to leave. Kincaid also stated:
 A: ... it was between him and the Supervisor.