Johnny L. MOORE, Plaintiff,

v.

INMONT CORPORATION, Defendant.

No. C–C–83–471–P.

United States District Court,
W.D. North Carolina.

April 4, 1985.

Donnie Hoover, Charlotte, N.C., for plaintiff.

John J. Doyle, Jr., Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, Charlotte, N.C., for defendant.

## MEMORANDUM AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Complaint filed by the Plaintiff Johnny L. Moore against Inmont Corporation ("Inmont" or "the Company") alleging the Plaintiff was subjected to racially discriminatory practices in his employment and was discharged because of his race. The trial was heard before the undersigned on January 10 and 11, 1985 in Charlotte, North Carolina. The Plaintiff was represented by Donnie Hoover and the Defendant was represented by John J. Doyle, Jr. After a full trial of the matter, the Court, having carefully considered the testimony and exhibits enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) This action was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and pursuant to 42 U.S.C. § 1981, the Civil Rights Act of 1866.

(2) The Plaintiff, Johnny L. Moore, a black male, formerly was employed by the Defendant as a "chemical dumper" or "production helper" at the Defendant's Charlotte, North Carolina manufacturing facility.

(3) The Defendant, Inmont Corporation, is a corporation licensed to do business in North Carolina.

The Defendant operates a manufacturing facility in Mecklenburg County, North Carolina, in which it engages in the production and sale of printing inks and textile colorings. The Defendant is subject to the jurisdiction of this Court and is an "employer" as defined by 42 U.S.C. § 2000e(b), being engaged in an industry affecting commerce and employing in excess of fifteen employees.

(4) This suit arises out of a charge of race discrimination filed by the Plaintiff with the Equal Employment Commission on November 2, 1982.

(5) The Complaint was filed more than 180 days after the filing of the aforesaid charge and within 90 days after the issuance of the right-to-sue letter by the EEOC.

(6) The Plaintiff was hired by the Defendant on November 3, 1980 and worked for the Defendant until August 28, 1982 at which time he was discharged on the stated ground of smoking in an unauthorized area.

(7) The manufacturing facility where the Plaintiff was employed consists of three central areas, the office area, the production area, and the warehouse/shipping area. The office area contains the administrative section of the Company. The production room is utilized for manufacturing inks. The warehouse/shipping area is utilized for storage of the completed product and for shipping or receiving goods and raw materials.

(8) The ingredients used to manufacture and package the inks include highly flammable, volatile substances. In addition, the inks are extremely flammable, hazardous materials.

(9) Due to the presence of the volatile substances in the facility, fire prevention is of the paramount concern and the plant is highly regulated to protect against fire. The National Electric Code ("NEC") specifies exactly what precautions the Company must employ to protect against combustion. The production room and the warehouse area are "classified" (hazardous) locations under Article 500 of the NEC. The production area, in which there are present open flammable materials, is a National Fire Protection Association ("NFPA") Class I, Division 1 location. The warehouse/storage areas is a NFPA Class 1, Division 2 location. Both areas are equipped with spark proof, explosive proof wiring, motors and other electrical equipment as required by the NEC for classified locations. For instance, an average house light switch would not be acceptable in the production area because of the arc. In addition, other equipment used in the production and warehouse areas of the facility is designed to conform with the requirements set forth in Article 500 of the NEC.

(10) Inmont has developed and implemented a safety program to curb fire hazards. The Company developed a safety committee to explain rules to the employees and the supervisors are responsible for giving a safety talk at the end of each week. In addition the Company has trained fire fighters.

(11) The Company promulgated a booklet containing the employee safety rules. The booklet is issued to all new employees who have to sign acknowledged receipt of the book. The Plaintiff received and signed for his booklet. Since smoking presents a possible source of ignition and consequently a potential fire and safety hazard particularly in the classified areas, the booklet contains numerous references to smoking prohibitions in unauthorized areas. *See, e.g.*, Plaintiff's Exhibit 6, pp. 3, 5, 6, 13.

(12) After an employee was caught smoking in an unauthorized area, to stress the importance of plant safety and to ensure against the dangers of smoking in hazardous locations, the Company promulgated and posted a written policy on October 28, 1980 which unambiguously states that any employee observed smoking in a no smoking area would be immediately terminated. Specifically, the notice as posted provides:

Subject:

SMOKING

Every employee of the Charlotte operation is well aware of the danger of smoking at this location.

Irregardless of the past practice, starting immediately anyone observed smoking in a non-smoking area will be immediately discharged.

Since the inception of this policy, a copy of this notice has been posted on the employee bulletin board adjacent to the production room.

(13) All new employees, including the Plaintiff, who were hired after the rule was posted, were aware of the smoking prohibition and the consequences for violating the policy, through their initial training with the Company and through periodic reminders at the safety meetings. The Plaintiff does not deny knowledge of the immediate termination rule. Instead the Plaintiff denies that he was smoking, or if he was smoking he denies knowing he was in an unauthorized area, or if he was smoking in an unauthorized area he contends other employees smoked in that area without being discharged.

(14) The main employee entrance to the facility is located in the shipping area. There is a no smoking sign on the outside of the building on the wall behind the main employee entry door. To get to the production area the employees enter the door in the shipping area and walk to the employee cafeteria where they follow a walkway around the perimeter of the shipping area to the production area at the rear of the plant. This corridor is adjacent to the employees' lockers, running from the production room to the employees' cafeteria.

(15) The corridor is marked with a solid yellow line which serves to demarcate the boundary area where smoking is permitted.

Although the Company periodically repaints the line, it naturally fades with time, especially with the presence of various solvents in the plant. Even though the line fades, it has remained in a substantially similar configuration for the past 18 years. Thus, by custom and usage the employees are aware of the smoking areas.

(16) On the day of the Plaintiff's discharge the evidence shows that the yellow line was visible with respect to the straight line from the production area to the cafeteria. In close proximity to the cafeteria, the line makes a right angle to compensate for the corner of the cafeteria. The Defendant's evidence shows that the line was painted at the end of the angle. The Plaintiff's evidence shows that the end of the right angle was not painted.

(17) There are five no smoking signs along the corridor reiterating the policy of no smoking in the production area and no smoking across the yellow line separating the corridor from the shipping area. In addition, there is a no smoking sign next to the entry door, which indicates that smoking is not allowed when entering the building.

(18) Immediately inside the employee entry is a small self contained office, where warehouse personnel do their paperwork. On the outside wall of this office facing the entry side of the building is the telephone where the Plaintiff was discovered smoking.

(19) This office was constructed in 1981, after the Plaintiff was hired. It is specifically designed and equipped so that air constantly flows into the office, creating positive pressure ventilation. The ventilation allows individuals inside the office to smoke while at the same time presenting no danger of ignition of the hazardous materials which are stored in the vicinity of the warehouse office. The employees who use this office are permitted to smoke inside of the office.

(20) The area surrounding the office has remained a no-smoking area and was so designated in August, 1982. Hazardous, flammable materials in the form of finished ink products are routinely stored and shipped from this area. Within a few feet of the office highly flammable solvents are regularly used to clean the drums prior to stenciling the drums for shipment.

(21) On the evening of August 28, 1982 the Plaintiff was working the third shift (11:00 p.m. to 7:00 a.m.) in the production area. During the course of the evening his uniform split and he needed to put on another uniform. His supervisor, Willis McDaniels, authorized the Plaintiff to leave the production area to change uniforms and to make a telephone call. The only free telephone was the telephone on the outside of the warehouse office located at the employee entrance. After the Plaintiff left the production area and entered the yellow lined corridor he began smoking a "duct" from a cigarette partially smoked earlier in the evening.

(22) As the Plaintiff walked down the corridor with the cigarette in his hand he saw and talked to a foreman, Allen Hardy. Mr. Hardy did not tell the Plaintiff to extinguish his cigarette before he crossed the yellow line. The Plaintiff contends Mr. Hardy intentionally set him up for the discharge by not warning him about smoking. Mr. Hardy credibly testified he did not warn the Plaintiff about smoking because he thought since the Plaintiff was carrying a uniform he was going to the lockers instead of the telephone.

(23) Mr. Hardy proceeded to the laboratory, discussed an order and doubled back to the shipping area, near the office. The Plaintiff proceeded to the telephone.

(24) When Mr. Hardy returned to the office he observed the Plaintiff holding a lighted cigarette in his hand while he was talking on the telephone located immediately outside the warehouse office. Mr. Hardy approached the Plaintiff, confirmed that the cigarette in his hand was lit and informed the Plaintiff that he was terminated for violating the Company's no smoking rule.

(25) The Plaintiff and Mr. Hardy located the Plaintiff's supervisor, Mr. McDaniels,

to advise him of the discharge. The Plaintiff asked to be given a break, that he simply made a mistake, having forgotten about the cigarette in his hand when he went to the telephone. Mr. McDaniels decided to notify the plant production manager, David Wilburn about the incident. After telephoning Mr. Wilburn, Mr. Hardy explained that the Plaintiff was observed smoking in a no smoking area. Mr. Wilburn ratified Mr. Hardy's decision to terminate the Plaintiff for smoking.

(26) At no time during his conversation with either Mr. Hardy or Mr. McDaniels did the Plaintiff contend that he was not smoking, that he was not in an unauthorized area or that he did not know the area outside the warehouse office was a no smoking location. To the contrary, the Plaintiff acknowledged the violation but maintained that he should be given special consideration and not terminated since his actions were not intentional. The Plaintiff explained that he simply forgot that the cigarette was in his hand when he entered the no smoking area to use the telephone, and that this mistake was not a sufficient reason to terminate his employment with the Company.

(27) On the Monday after the Plaintiff was discharged he tried to speak with the plant manager, John Ganote. His request was denied in accordance with Mr. Ganote's policy not to have *ex parte* discussions with terminated collective bargaining unit employees in the absence of their union representative. Instead, Mr. Ganote adheres to the bargaining grievance procedures before he becomes directly involved in reviewing any discharge decision.

(28) The Plaintiff asked the union shop steward, Melvin Broome, to prepare and submit a grievance on the Plaintiff's discharge. The grievance does not state that the Plaintiff was not smoking. The grievance was denied and the denial was affirmed in the local hearing. Due to an unexplained mix-up between the Plaintiff and the union, the grievance was not timely submitted to arbitration. Accordingly, the request for arbitration was denied.

(29) At the trial and in the Plaintiff's amended Complaint the Plaintiff contended that he was not smoking, but was merely holding a completely burned out filter in his hand while using the telephone and that prior to this time he did not know the area around the telephone was a no smoking area.

(30) The Court does not credit the Plaintiff's testimony that he was not smoking or that he did not know he was in a no smoking area. The Court finds it significant that the Plaintiff's recollection of the incident has changed. Mr. Hardy and Mr. McDaniels (a black supervisor) both testified that the Plaintiff admitted the offense but requested leniency in that it was unintentional. The union grievance does not say anything about only having an extinguished "duct" in his hand. Further, the Plaintiff swore under penalty of perjury in his EEOC charge that

> "I admit to smoking in a non smoking area, however, I had just crossed over from an authorized smoking area and had not realized I had crossed the line that separates the two areas.
>
> \* \* \* \* \* \*
>
> When Allen Hardy, White, Foreman, caught me smoking in an a [sic] unauthorized area, he immediately discharged me."

(31) In addition to the conflicting self-serving nature of the Plaintiff's own testimony, the circumstantial evidence undermines the credibility of Plaintiff's contentions. The plant policy was no smoking unless in an authorized area, and not, smoking allowed unless in an unauthorized area. The actual presence of flammable materials in the office area corroborates the fact that the Company would and did designate this area as a no smoking area. Further, there was a no smoking sign at the entry which sign clearly would put anyone on notice not to smoke when entering the building. In addition, even if the yellow line was discolored on the corridor, there was no evidence of any yellow line near the phone, which line would indicate

that smoking is allowed. Finally, there was not any testimony from the Plaintiff that he had ever smoked in that area before. After an employee has been with a Company for a couple of years he knows through custom and practice what he can and cannot do. The Court, therefore, finds that at the time of his discharge the Plaintiff was smoking in an area which the Plaintiff knew to be a no smoking area.

(32) The Plaintiff contends that even if he was smoking in a no smoking area, other employees have engaged in the same or similar conduct without being discharged. In support of this contention the Plaintiff testified that Allen Hardy, a white foreman, and Bill Kelly, a black supervisor smoked in this area. The Defendant's evidence was that although they smoked inside the office, they did not smoke outside the office. Even if it is assumed that the two men did smoke in the unauthorized area, the fact that Mr. Kelly is black and was not reprimanded negates the Plaintiff's argument that the no smoking policy was only applied to him because he was black.

One of the Plaintiff's witnesses, Eric Straite, testified that Frank Morris, a white production area employee smoked in the vicinity of the telephone. The Court does not find Mr. Straite's testimony to be credible. Mr. Straite did not identify when or how often he observed Mr. Morris smoking. He did not state whether any supervisor was aware of Mr. Morris' smoking. The other witnesses did not testify that Mr. Morris smoked and the union steward testified that he never observed anyone smoking in that area. Further, as Mr. Straite was fired by the Defendant for excessive absenteeism it is reasonable to believe his testimony is at least partially biased.

(33) The documentary evidence concerning discipline meted for the no smoking policy clearly shows that the immediate termination clause was uniformly enforced. The only employee caught smoking in this area who was not terminated was black, and it was his conduct which led to the promulgation of the current written no smoking/immediate termination rule. Prior to the October 1980 rule, Fred Williams, a black warehouseman, was observed lighting a cigarette at one of the warehouse loading docks. Immediately after Mr. Williams lit the cigarette he realized what he had done and extinguished his cigarette. A supervisor, however, observed the violation and reported it to the plant management. Initially Mr. Williams was terminated for the offense, but ultimately after a two month suspension without pay, he was reinstated due to the mistaken nature of his conduct and the fact that the consequences for violating the policy had not been sufficiently defined or noticed to the employees. It was precisely because of the "extenuating circumstances" plea raised by the union in Mr. Williams' case that the Company promulgated the no smoking/automatic termination rule which went into effect in October 1980. Automatic discharge was provided for in that rule to emphasize the seriousness of the hazard and to avoid the defense of extenuating circumstances raised in Mr. Williams' case.

(34) After the policy was adopted and posted in October, 1980 all employees observed smoking in an unauthorized area have been terminated, including the Plaintiff. On January 27, 1981, David Wilburn, the production manager, observed two black employees, Robert Ballard and Rickey Cherry, smoking in an unauthorized area. They were immediately terminated for the offense. The employees filed a grievance protesting their terminations and the complaint was heard by an arbitrator. On June 3, 1981 the arbitrator issued an opinion and award denying the grievance and affirming the discharge, noting that

In this case, there is no doubt that the no smoking rule is reasonable and necessary. There is no doubt that these Grievants knew the rule and the safety reasons for adhering to the rule. Smoking in unpermitted areas creates substantial risks of harm to persons and property. The violation of this rule clearly warrants the discharge of an employee. Any other result would undermine the

Company's ability to maintain a preventive safety program.

There were no other employees observed violating the rule, until the Plaintiff was discharged.

(35) In light of the above, the Court finds that the no smoking/automatic termination policy was applied uniformly to all employees, including the Plaintiff, regardless of race.

(36) The Plaintiff also asserts that a white employee, Frank Morris, committed a comparable dischargeable offense, however, he was not discharged. Mr. Morris was a forklift operator. The end of the forklift consists of exposed metal which metal is a potential fire hazard if, through careless operation, the forklift collides with other metal objects in the production and warehouse area causing sparks. A spark in an unauthorized area would be as dangerous as smoking in an unauthorized area. The uncontested evidence is that Mr. Morris was intoxicated several times while on the job and operating his forklift. He, however, was sent home and suspended instead of fired. Although the supervisors thought Mr. Morris was intoxicated they never observed him consuming any alcohol. Mr. Morris was eventually fired for hitting a trailer door. The Company could not report that they were terminating him because he was intoxicated.

(37) Although the toleration of Mr. Morris' intoxication on the job might initially be suspect, any inference of racial discrimination was credibly refuted by the fact that black employees also were not discharged if intoxicated and by recognizing the constraints placed on the employer under the collective bargaining contract.

The policy of the Company is to terminate employees drinking if the employee is *observed consuming* alcohol at work. If the supervisor does not observe the consumption but merely observes the apparently intoxicating conduct the employee is sent home. This discrepancy in enforcement is due to the difficulty of proof required under the collective bargaining contract. The employees are protected by a collective bargaining contract which requires the employer to prove beyond a reasonable doubt that an employee actually committed the offense. With controlled substances there is great difficulty in proving beyond a reasonable doubt that an employee is intoxicated unless the supervisor actually observes the consumption. Thus, such proof being necessary in order to make the termination of a bargaining unit employee withstand the scrutiny of arbitration, employees reporting to work who appear to be intoxicated are merely sent home, instead of discharged. Conversely, if an employee is observed consuming alcohol he is immediately discharged.

The Plaintiff's evidence further showed, through the testimony of Carl Smith, a black employee, Eric Straite, a black terminated employee, and Melvin Broome, a white shop steward, that the Company did not discharge, but instead sent home Donald Davis and other black employees intoxicated on the job.

(38) In light of the above, the Court finds that to compare the enforcement of the smoking policy with the enforcement of the drinking policy is to compare apples with oranges. Although there is a difference in the consequences between the smoking and drinking policies the difference is not attributable to race. The Company applied the smoking policy uniformly to all employees and applied the drinking policy uniformly to all employees.

(39) Accordingly, the Court finds that the Plaintiff was discharged on August 28, 1982 for smoking in a no smoking area and his discharge for smoking was not a pretext for racial discrimination.

(40) The Plaintiff also testified about various forms of harassment against him such as verbal criticism, incorrect discipline reports, being assigned menial tasks, or alternatively not being assigned menial work. The cause of much of this "harassment" according to the Plaintiff's testimony was not because of race—the Plaintiff being "singled out among blacks and whites". For example, the Plaintiff com-

plained that he was denied light duty work by Mr. McDaniels. There was not any credible evidence that Mr. McDaniels was racially motivated in denying the Plaintiff light duty work. Mr. McDaniels explained that the work was denied because the Plaintiff did not have an on-the-job injury which is required to lessen an employee's job responsibilities. Further, Mr. McDaniels is black.

(41) Similarly, the Plaintiff said he was racially harassed by Bill Kelly and David Woods. Both men are black production supervisors. David Woods credibly testified that he did not harass the Plaintiff or single him out to sweep the floor. Mr. Kelly denied harassing the Plaintiff, but agreed that he did have to talk to the Plaintiff about his excessive absentee/tardy record. To be assigned work and receive constructive criticism from a supervisor is a normal part of any employee's job. There is not any evidence linking the employment discussions and reports with race.

(42) The Plaintiff, in addition, placed racial significance on an incident in which Mr. Morris verbally threatened the Plaintiff. Although Mr. Morris did exchange threats with the Plaintiff, the evidence also showed that the Plaintiff "let the word out at the plant that I know how to box" and that I have a "right to defend myself." Faced with Mr. Moore's and Mr. Morris' dispute, Mr. Ganote warned both employees against their disruptive conduct and informed them that any altercation on or off the premises would result in immediate termination. Mr. McDaniels also told the employees to stay out of trouble and if they encountered further problems with each other they should work out the problems through Mr. McDaniels. The Court finds the Company's actions in dealing with this problem to be prudent, sensible, and intelligent and without any racial bias.

(43) The Court accordingly finds that the Defendant did not harass or encourage, condone, or permit other employees to harass the Plaintiff.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1343.

(2) Both Title VII and Section 1981 prohibit discrimination in employment because of an employee's race. The well-known order and allocation of proof set forth in the seminal cases of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) are applicable to the Plaintiff's claims under Title VII. *Burdine,* the more recent case, summarized the three stages in the proof of such claims: the claimant must prove by a preponderance of the evidence a *prima facie* case of discrimination; if the claimant proves a *prima facie* case, the employer has the burden to articulate a legitimate nondiscriminatory reason for the employment decision; once the employer articulates the reason, the claimant then has the burden to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were but a pretext for discrimination. *Burdine, supra,* at 253, 101 S.Ct. at 1093. At all times the plaintiff retains the ultimate burden of persuading the court that he has been the victim of intentional discrimination. *Burdine, supra,* at 256, 101 S.Ct. at 1095.

(3) In Title VII cases, such as the instant action, in which disparate treatment is the basis of the Plaintiff's claim, the Plaintiff must prove intentional discrimination. The trier of fact may rely on inferences rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence, whether direct, circumstantial or otherwise. *Texas Department of Community Affairs v. Burdine, supra; Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

(4) To establish a *prima facie* case of discriminatory discharge the Plaintiff must show that: (1) he is a member of

a protected class; (2) he was qualified for the position he held; (3) despite his qualifications he was discharged; and (4) after his discharge, the employer continued to seek applicants from persons of complainant's qualifications. *Smith v. University of North Carolina,* 632 F.2d 316 (4th Cir. 1980). Alternatively, a plaintiff may establish a *prima facie* case by showing that he was discharged and that a non-black person whose conduct was similar to his was retained. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Anderson v. Savage Laboratories, Inc.,* 675 F.2d 1221, 1225 (11th Cir.1982); *Aquamina v. Eastern Airlines, Inc.,* 644 F.2d 506, 508 (5th Cir.1981).

■ (5) In the instant situation, although the Plaintiff failed to present any evidence as to his replacement the undisputed evidence is that the Defendant found the Plaintiff's qualifications and performance to be satisfactory. The Plaintiff was not discharged for insufficient work performance, but for violating an important Company policy. The Plaintiff's evidence further was to the effect that Frank Morris, a white male, was not discharged for conduct similar to the Plaintiff's conduct. Accordingly, the Court finds that the evidence supports a *prima facie* case of discrimination.

■ (6) Even though the Plaintiff established a *prima facie* case, it is manifest that the Plaintiff's breach of the fully published no smoking/automatic termination policy was a legitimate non-discriminatory reason for the employment decision in contest. Similarly, the valid difference between enforcement of the drinking policy and enforcement of the smoking policy and the fact that the Company did not discharge black employees observed intoxicated at work were legitimate non-discriminatory reasons for retaining Mr. Morris while discharging the Plaintiff. Thus, as the evidence shows that the Plaintiff violated the smoking policy, that the smoking policy was uniformly applied to all employees and that there exists a legitimate difference in

policing the two violations the Plaintiff did not prove that the Defendant's reason for his discharge was pretextual.

■ (7) With respect to the Plaintiff's claim under Section 1981, it is established that in order to prevail the Plaintiff must offer evidence showing discriminatory animus by the Defendant in terminating the employment. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As discussed previously, the evidence does not establish any discriminatory intent in terminating the Plaintiff and any claim under Section 1981 similarly fails.

(8) Any finding of fact which is determined also to be a conclusion of law is so deemed, and any conclusion of law which is determined also to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS, HEREBY, ORDERED, ADJUDGED, AND DE-CREED:

(1) That this action is DISMISSED WITH PREJUDICE;

(2) That each party shall pay his and its own costs, including attorney's fees; and

(3) The Clerk is directed to enter judgment pursuant to Fed.R.Civ.P. 58.