**Cletus C. PARKER, Plaintiff,**

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendant.**

**No. 82 C 4254.**

United States District Court, N.D. Illinois, E.D.

June 30, 1983.

Lonny Ben Ogus, Chicago, Ill., for plaintiff.

Michael A. Warner, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Cletus Parker ("Parker") sues Federal National Mortgage Association ("FNMA") under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 ("ADEA"),[1] alleging FNMA (1) terminated his employment (Count I) and (2) classified him as "retired" rather than "terminated" (Count II as amended) because of his age. FNMA has moved for summary judgment. For the reasons stated in this memorandum opinion and order FNMA's motion is granted.

*Controlling Legal Principles*[2]

Section 623(a) makes it unlawful for an employer:

---

1. ADEA provisions will be cited to their section numbers in Title 29, simply as "Section—."

2. Because of the misdirected approach Parker has taken to this case in his memoranda, this opinion will reverse the order this Court nor-

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.[3]

As *Golomb v. Prudential Insurance Co. of America,* 688 F.2d 547, 550 (7th Cir.1982) (emphasis in original) teaches:

Thus, to establish a cause of action under the ADEA, a claimant must show that he was discriminated against *because of* his age.

ADEA does not make it unlawful, for instance, simply to discharge an employee between the ages of 40 and 70. ADEA violations occur only when employers allow age to be "a determining factor" in discharge or other employment decisions. *Id.* at 551–52 & n. 2.

In both *Golomb, id.* at 551 and *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1219 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981), our Court of Appeals approved for use in ADEA cases the ping-pong-match burden-of-proof formula that the Supreme Court has devised for employment discrimination cases under Title VII of the Civil Rights Act of 1964. As summarized in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted), that formula provides:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. . . .

The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. . . . [That] division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question.

But the Supreme Court has recently reminded litigants and lower courts they should not lose sight of that "ultimate question"—intentional discrimination vel non— as they work through the *Burdine* formula in a trial of an employment discrimination action on the merits. *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

That admonition presumably applies as well in the "mini-trial" conducted on a motion for summary judgment. Our Court of Appeals has recently restated the law governing such a motion in *Egger v. Phillips,* 710 F.2d 292 at 296–297 (7th Cir.1983) (citations omitted):

A party seeking summary judgment under Fed.R.Civ.P. 56 must demonstrate the absence of a genuine issue of material fact. . . . In judging whether or not the movant has met this burden, the court must view the evidence submitted by the

---

mally follows. It will first establish the legal framework against which the facts are to be viewed before turning to those facts.

**3.** As amended in 1978, Section 631(a) applies ADEA's prohibitions to employees between the ages of 40 and 70. *See Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 748 n. 9 (7th Cir.1983).

movant in the light most favorable to the non-moving party.... If, and only if, the movant meets his initial burden, it is incumbent upon the opposing party "to set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate [as a matter of the governing law], shall be entered against him." ... However, it is always prudent to respond to a motion for summary judgment, even if the opposing party believes that the movant has failed to sustain his initial burden.

Moreover, a factual dispute does not preclude summary judgment unless, of course, the disputed fact is outcome determinative under the governing law. It is thus axiomatic that even in the face of some factual disputes, "where the *undisputed facts* demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate," ... just as it is plain that if genuine factual disputes are resolved in favor of the non-movant, summary judgment may be entered in favor of the movant if appropriate as a matter of law.

Blending that analysis with governing ADEA law yields the following:

1. FNMA has the initial burden of showing the absence of a genuine issue as to its intention to discriminate against Parker because of his age.

2. If FNMA meets its burden Parker must set forth *facts* showing a genuine issue as to FNMA's intent.

3. Only if there is no genuine issue of fact on that score may summary judgment be granted FNMA.

This Court is not unmindful of the difficulty of granting summary judgment when the central material issue is one of intent. But summary judgment *is* proper where a "plaintiff [has] no indications of motive and intent, supportive of his position, to put on the scales for weighing." *Kephart,* 630 F.2d at 1218. That is the precise situation here: Parker's is "a wholly empty case." *Id.*

### *FNMA's Evidence* [4]

FNMA is a publicly-held United States corporation with its home office in Washington, D.C. and regional offices in Atlanta, Chicago, Dallas, Los Angeles and Philadelphia (Mem. 2). FNMA serves the secondary mortgage market, purchasing FHA/VA and conventional residential mortgages for primary lenders and then servicing those purchased mortgages (Parker Dep. 15–17).

Before late 1981 FNMA's Chicago office comprised six divisions: Home Mortgage, Project Mortgage, Urban Activities, Regional Counsel, Regional Controller and Regional Administration. Parker was employed as a Senior Loan Representative in the Project Mortgage Division. That division (1) committed, purchased and serviced FHA multi-family residential mortgages and (2) approved condominium and subdivision development projects (*id.* at 17).

In late 1980 the Project Mortgage Division consisted of one purchasing team, four servicing teams and the regional appraiser and underwriter and their secretaries. It was the purchasing team's responsibility to approve the purchase of multi-family residential mortgages submitted to FNMA by its customers (*id.* at 20–21). Once a mortgage was approved and purchased, the servicing teams would take over the loan portfolios and oversee such things as the regu-

---

**4.** In addition to documentary evidence FNMA has cited the depositions of (1) Parker ("Parker Dep.") and (2) its Chicago Senior Assistant Regional Vice President Howard Morton ("Morton") ("Morton Dep."). FNMA has also submitted the following affidavits:

    1. Morton's April 18, 1983 Affidavit ("Morton Aff.");

    2. the April 18, 1983 Affidavit of FNMA's Chicago Manager for Administration James Domenico ("Domenico") ("Domenico Aff.");

    3. the April 18, 1983 Affidavit of FNMA Chicago Assistant Regional Vice President for Accounting and Administration Andrew Kim ("Kim") ("Kim Aff."); and

    4. Domenico's June 3, 1983 Affidavit ("Domenico Supp. Aff.").

Because the evidence is presented both fully and fairly in FNMA's opening memorandum, this section of this opinion draws freely on the language and structure of that memorandum.

lar mortgage payments by the property owner and the current status of tax bills, insurance policies and chattel mortgages (*id.* at 21). Each servicing team had a Senior Loan Representative at its head and also included one Loan Representative, one or more Loan Technicians, a secretary and one or more clerks (*id.* at 19). Parker (age 62) was one of four Senior Loan Representatives heading the servicing teams, the others being Thomas Monico ("Monico," age 31), Meredith Wright ("Wright," age 55) and Craig Bromann ("Bromann," age 31), while the Senior Loan Representative on the purchasing team was Robert Haren ("Haren," age 57) (Morton Aff. ¶ 4).

In January 1981[5] FNMA, responding to declining mortgage demand, implemented the first of two major reorganizations affecting the Project Mortgage Division. Its Washington home office directed that the Chicago office servicing teams be reduced in number from four to two (Parker Dep. 24). To determine who should head the two remaining teams, Morton (age 60) reviewed the qualifications of the four incumbent Senior Loan Representatives. First Morton chose Monico, whose job performance had always been consistently rated as superior. Morton also decided Wright's performance and qualifications were better than those of the other two Senior Loan Representatives and thus he too should remain as a supervisor. Instead of terminating Bromann and Parker as surplus personnel, Morton elected to retain them as Senior Loan Representatives on the two remaining servicing teams, but their positions were designated as "overfill" positions with the hope they could be placed in other positions as vacancies occurred through normal attrition. Haren was retained as the Senior Loan Representative on the purchasing team (Morton Aff. ¶ 5).

Morton met with Parker in January and explained the basis for the cutback and its effect on him. Though Parker did not dispute Morton's selection of Monico to head one of the remaining servicing teams, he questioned the selection of Wright over himself to head the second team. Morton explained Wright's previous experience as a property manager had worked to Wright's advantage in the decision (Parker Dep. 24, 27).

Due to the continuing decline in the mortgage industry, in late 1981 FNMA's home office instituted another major reorganization calling for substantial reduction of its work force. Following preparation of an extensive feasibility study, FNMA decided to consolidate the servicing of project mortgages for all its five regional offices into the Atlanta and Los Angeles offices. That would eliminate the servicing function of the Chicago, Dallas and Philadelphia offices, and more specifically the Chicago loan portfolios would be transferred to Atlanta and Los Angeles (Morton Aff. ¶ 6). At the same time the home office instituted a streamlined selling and servicing system to simplify many FNMA procedures in servicing and purchasing home mortgages. Finally, more responsibility was placed on customer companies to service home mortgages (*id.;* Morton Dep. 12). As a result the Chicago office consolidated its Home Mortgage and Project Mortgage Divisions into a single new Production and Loan Administration Division (Morton Aff. ¶ 7), and Chicago work force requirements were reduced from 107 to 84 employees, eliminating 18 job positions in the project mortgage servicing teams and five other positions in other divisions (*id.;* Morton Dep. 13).

In November Chicago office senior management met to determine which of the existing Chicago employees would be retained to fill the limited number of available job positions. In attendance were Regional Vice President Jack Hayes ("Hayes," age 43), Assistant Regional Vice President of Home Mortgages Edward Sambol ("Sambol," age 57); Assistant Regional Vice President of Marketing Francis Moncey ("Moncey," age 53), Morton and Kim (age 51). (Morton Aff. ¶ 8).

Before that meeting each manager was asked to review the affected employees

---

**5.** All subsequent dates without year designa-     tions were also in 1981.

within his division. Morton was responsible for reviewing Project Mortgage personnel. When Senior Loan Representatives were considered, based upon Morton's recommendations it was decided to retain Haren as Senior Loan Representative for the purchasing function, which remained in Chicago as part of the new Production and Loan Administration Division. Based on his superior qualifications and prior performance, Monico was designated Manager, Loan Administration, in that newly-created Division. Wright and Bromann had previously expressed interest in the Chicago office Urban Activities division (now the Marketing Division), which was involved in marketing FNMA programs for community development in urban areas. Both of them had previously been interviewed and favorably reviewed by Moncey, the official in charge of the Urban Activities area. Though they had not then been placed in the division, they expressed a continuing interest in future vacancies and were told they would be considered for any such vacancies. Under the major 1981 reorganization, two positions in the newly-created marketing area dealt with this type of activity and had to be filled. At the November meeting management determined that based upon their prior expressions of interest and their qualifications, Wright would be made Community Development Coordinator and Bromann Senior Loan Representative in the Marketing Division (*id.*).

Because there were no other Chicago office Senior Loan Representative positions or equivalent jobs, Parker was told his services would not be required after January 31, 1982. Morton personally told each affected member of the Division of FNMA's decision and the reason for the decision (*id.* at ¶ 9; Parker Dep. 35–36). FNMA also notified each employee by letter. Parker's, received December 8, said (Complaint Ex. A):

> [B]ecause of changes in how the Corporation intends to conduct its future business and the centralization of multifamily housing activities in Atlanta and Los Angeles, your services will not be required after the close of business on January 31, 1982.

Shortly thereafter Morton and Parker first discussed the possibility of Parker's transferring to the Atlanta office. When Parker indicated he would be interested, Morton called the Atlanta office to ask about such a transfer (along with the project mortgage loan portfolios). Atlanta personnel replied they would see if such a transfer could be authorized and would get back to Morton (Morton Aff. ¶ 10).

About December 10 Parker met with Domenico to discuss the term of Parker's termination. Domenico advised Parker he was eligible for retirement benefits because he had more than five years of service with FNMA and was over 55 years of age. During the discussion, Parker said he understood the business reasons for his termination but asked whether he could be transferred to the Atlanta office (Domenico Aff. ¶ 4; Parker Dep. 56). Parker said he would like the transfer so he could work another one-and-a-half years until he was 65—when he had planned to retire anyway (Domenico Aff. ¶ 4).

Thereafter Morton received word Parker's transfer to the Atlanta office had been authorized. Morton then spoke with Parker and told him Atlanta was interested and wanted him to work there. Parker told Morton he could not give him a yes or no answer at that time. Morton later spoke with Parker again and was given the same answer. Morton then referred the matter to Kim to get an answer from Parker (Morton Aff. ¶ 11; Morton Dep. 35–36).

On January 8, 1982 Kim spoke to Atlanta Assistant Regional Vice President for Accounting and Administration Lewis Jones ("Jones"). Jones formally asked Kim to offer the Senior Loan Representative job to Parker on these terms:

1. Parker's job level would be 57 (the same as his Chicago position);

2. FNMA would pay for:

  (a) the moving expenses of normal household goods in accordance with corporate policy;

  (b) transportation expenses of Parker and his wife; and

(c) two weeks of lodging and food expenses while Parker looked for a house in Atlanta.

3. Also in accordance with corporate policy, FNMA would not be involved in the sale of Parker's Chicago residence or the purchase of a new residence in Atlanta. (Kim Aff. ¶ 4).

Parker told Kim he would need some time to think over the offer and said he would inform Kim of his decision by January 12, 1982 (id. at ¶ 5).

Parker was absent from work on sick leave January 12, 1982. After he came to work the next morning, Kim asked if he had reached a decision. Parker told Kim that in light of what FNMA had done with the servicing function in Chicago he thought there would be no guarantee FNMA might not move the servicing function out of Atlanta as well. Parker therefore had doubts about the longevity of the Atlanta office job and insisted upon a written employment contract. Parker also expressed worry about his ability to sell his house in Chicago and FNMA's unwillingness to be involved in that sale. He therefore told Kim his decision regarding the transfer was "not yes" (id. at ¶ 6). Kim tried to call Jones later that day to advise him of Parker's response, but the Atlanta office had been closed due to weather conditions. Because Kim was going on vacation the next day, he asked Domenico to follow up on the matter (id. at ¶¶ 7–8; Domenico Aff. ¶ 5).

Domenico met with Parker the next day, January 14, 1982 and asked for a more definitive answer. Parker told Domenico he would have to decline the transfer to Atlanta for the following reasons (id.; Parker Dep. 58–59):

1. the possible loss on the sale of his home in Chicago;

2. his wife's job in Chicago; and

3. the lack of any guaranty that the new job in Atlanta would be permanent there.

Parker made no attempt to communicate with any FNMA Atlanta officials or set up an interview in Atlanta to discuss his concerns about the longevity of the position offered him (id. at 68).

Parker continued to work for FNMA through January 31, 1982 (id. at 9). Upon termination he received benefits due him under FNMA's retirement plan. He did not receive severance pay because FNMA's policy provided such pay only to involuntarily terminated employees who are ineligible for retirement benefits (Domenico Aff. ¶ 6).

From the just-completed factual recital it is clear that:

1. FNMA's decision to discharge Parker was based on a business judgment as to the relative strengths of its staff members, a judgment it was forced to make because of a decline in its business.

2. Indeed FNMA sought to avoid Parker's discharge by offering him the lateral transfer to Atlanta.

3. Parker's post-discharge classification as "retired" rather than "terminated" was in accord with age-neutral FNMA policy as to entitlement to severance pay.

In all, FNMA's evidence shows Parker's age was not a factor in its decision as to his employment and subsequent classification.

### Parker's Response

Parker admits (Ans. Mem. 4) he must produce "some evidence" to counter FNMA's. But that means Parker must produce facts raising a genuine issue as to FNMA's intent—bare conclusory allegations and assertions will not do. See Menefee v. General Electric Co., 548 F.Supp. 619, 621 (N.D.Ill.1982). Although Parker confirms (1) he is within the age group protected by ADEA, (2) he was discharged and (3) he was then classified as "retired," he has shown no facts suggesting a causal link between his age and FNMA's decisions. See id. at 623.

Parker first cites (Ans. Mem. 6 and App. B) a late 1978 Performance Review of Monico, in which it was said:

This is one of the younger members of the Regional staff who, with the others,

comprise a strong asset base that portends well for the Corporation.

Parker seeks to read into that statement an indication of FNMA's unlawful preference for its younger employees. But (1) the Monico evaluation, in context, is merely descriptive and neutral on its face, (2) that evaluation does not imply *negative* views as to older employees and (3) in any event, FNMA simultaneously praised Parker for his experience and noted the *drawbacks* of Monico's youth (FNMA R. Mem. 3–4 and Exs. 1 and 2; Pl. Ans. Mem. App. B). In short, Parker's reading of Monico's 1978 evaluation proves only that all things look yellow to the jaundiced eye.

Parker then says (Ans. Mem. 10) his senior-level salary was a factor in FNMA's decision to discharge him.[6] But Parker's own deposition testimony confirms FNMA's offer to transfer him laterally to Atlanta, a transfer he refused on grounds unrelated to the quality of that position (Parker Dep. 58–60). FNMA's transfer offer certainly refutes the claim it unlawfully targeted Parker's salary—as a surrogate for age—in deciding whom to discharge.[7]

Parker's fallback position (Ans. Mem. 7–9, 12) is a quasi-statistical analysis of the results of FNMA's reduction in its work force. But that analysis lumps together FNMA's employees regardless of the different divisions to which they were assigned, and so Parker is just not responsive to FNMA's account of its particular problems with its Chicago Project Mortgage Division. See R. Mem. 7. Within that division the numbers of employees are really too small to generate statistically valid inferences of

discriminatory intent. *See Soria v. Ozinga Bros., Inc.,* 704 F.2d 990, 995 (7th Cir.1983) and cases there cited.[8] Moreover, Parker's analysis of the "statistics," not surprisingly, is colored by the preordained conclusion he wants to reach—the "statistics" simply do not lead to inferences in his favor. See R. Mem. 8–10.

Finally, as to his Count II claim Parker has produced *no* facts in support of his position. Ans. Mem. 14 does not cite any facts suggesting Parker's classification was done for any reason other than the one advanced by FNMA: His entitlement to retirement benefits meant he would be "retired" and not "terminated." That determination in fact *rewards* length of service regardless of age!

### Conclusion

There is no genuine issue as to any fact material to FNMA's intent in discharging Parker and classifying him as "retired." FNMA is therefore entitled to a judgment as a matter of law. Its motion for summary judgment is granted[9] and this action is dismissed with prejudice.

---

**6.** In fact Haren, who it will be recalled was kept on by FNMA, was paid more than Parker in 1981 (R. Mem. 4 and Exs. 3 and 4).

**7.** In fact on one view of the matter the transfer offer might wholly negate the possibility FNMA discriminated against Parker at all. But perhaps Parker is entitled to the indulgence and transfer offer might have been an underhanded way of burdening him because of animosity towards his age. On that score the problem is Parker shows no *facts* to support that overly favorable possible inference. Parker's bare assertions—not *facts*—as to the discriminatory terms of his transfer offer (Ans.

Mem. 10–11) are contradicted by the *facts* in Domenico Supp. Aff. ¶ 2.

**8.** Note also statistical evidence really goes to disparate *impact,* not treatment. *Soria,* 704 F.2d at 994–97. But perhaps Parker uses "statistics" only to try to show FNMA's proffered legitimate reasons to discharge and classify him are pretextual. *See id.* at 994.

**9.** FNMA's victory renders moot its argument (Motion ¶ 6) as to mitigation of damages. Similarly Parker's informal cross-motion for summary judgment (Ans. Mem. 15) is of course denied.