Kenneth A. GILL, Plaintiff,

v.

WESTINGHOUSE ELECTRIC CORPORATION, et al., Defendant.

No. 83 C 1838.

United States District Court,
N.D. Illinois, E.D.

March 6, 1984.

Murray B. Woolley, Chicago, Ill., for plaintiff.

Anthony J. Crement, Jeffrey S. Heller, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Kenneth Gill ("Gill") originally sued both Westinghouse Electric Corporation ("Westinghouse") and Local 1105, United Electrical Radio and Machine Workers of America ("Union"), charging they had:

1. imposed racially[1] discriminatory discipline on him in violation of 42 U.S.C. § 1981 ("Section 1981") (Amended Complaint Count I); and

2. violated their collective bargaining agreement and Labor Management Relations Act § 301, 29 U.S.C. § 185, by (a) their handling of Gill's resulting grievance and (b) Westinghouse's layoff of

---

1. Gill is black.

Gill while retaining less senior employees (Amended Complaint Count II).

In its July 27, 1983 memorandum opinion and order, this Court granted (a) Union's Fed.R.Civ.P. ("Rule") 12(b)(6) motion to dismiss Count I and (b) both defendants' Rule 56 motions for summary judgment on Count II. 568 F.Supp. 479.

Westinghouse now moves for summary judgment on Count I. For the reasons stated in this memorandum opinion and order, that motion is granted.

### Facts [2]

On December 3, 1982 Gill, while operating an industrial jeep, struck an electrically operated door gate and some storage racks, causing damage at least to the door gate. Gill reported the incident to his supervisor, Sue Hill ("Hill"), who in turn told General Foreman Stan Kurdziel ("Kurdziel"). Kurdziel then told Gill to go to his office for a conference.

Several Westinghouse supervisors and Union representatives attended the conference, where Gill was asked to explain what happened. In so doing Gill said his head was "floating" [3] and the door seemed to stick while it was opening. After a short discussion Kurdziel told Gill he was suspended for an indefinite period of time pending further investigation of the accident. On December 17, 1982 Gill attended another meeting with both Westinghouse and Union officials. Gill promised a better effort in the future and was warned fur-

ther misconduct would result in his discharge. Gill returned to work that day.

Gill claims the two-week suspension without pay was motivated by racial animus. In support of that claim he asserts:

1. He was disciplined differently from three white employees.[4]

2. Westinghouse supervisors are racists.

3. Westinghouse did not follow its own rules in imposing discipline, did not give Gill any written notice of its reasons for the suspension until after he was reinstated, and gave different reasons for his suspension in its interrogatory answer than in the post-suspension written notice.

### Summary Judgment

■ Westinghouse argues none of the evidence adduced in the course of this litigation supports any inference that the discipline imposed on Gill was racially discriminatory. To keep this action alive against Westinghouse's motion, Gill must present enough evidence to raise a genuine issue of fact as to the reasons for his suspension. Although he need not at this time *prove* racial discrimination, he must bring forth enough evidence to raise an inference of such discrimination. *Korf v. Ball State University*, 726 F.2d 1222, at 1226 (7th Cir. Feb. 8, 1984). Gill, "a party who resists summary judgment[,] cannot hold back his

2. Other relevant facts are stated in the text discussion following this "Facts" section.

3. Gill testified at his deposition that before the accident he had been transferring paint from one barrel to another and the fumes had affected him. Gill did not make that explanation at the post-accident conference.

4. Gill's Br. 3 claims he has information as to a fourth white employee, who was originally suspended or discharged for conduct like Gill's, then "almost immediately reinstated on the basis of an earlier incident involving another white employee who received no discipline" (and see Gill's Br. 8). Gill has not seen fit to provide any *evidence* to this Court, contenting himself with the unsupported assertions in his brief. In reply Westinghouse has provided an affidavit setting forth the facts of what it understands to be the other incident. There a white

employee was originally fired for hitting a crossbar while operating an industrial jeep. That discipline (far more severe, it will be noted, than that imposed on Gill) was vacated by Westinghouse when it learned other employees had struck the same low crossbar and had not been terminated. Nonetheless Westinghouse determined the employee was still negligent and suspended him for four days (the time it took to investigate the accident) without pay. That employee had no prior record of industrial jeep accidents, and the investigation was conducted more rapidly than Gill's investigation because supervisor Perratto was not in town while Gill was disciplined. Like the three examples cited in the text, this incident does not raise an inference of discrimination, as Gill is not situated similarly to the employee involved.

evidence until the time of trial" and expect his lawsuit to survive Westinghouse's motion. *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969).

### Section 1981

Whether or not Title VII's three-step analysis, as enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to every Section 1981 case, the basic inquiry is the same: Was Gill suspended for an impermissible reason of racial animus? *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 364–67 (7th Cir.1983); *T & S Service Associates, Inc. v. Crenson,* 666 F.2d 722, 724 (1st Cir.1981); *Meyers v. Ford Motor Co.,* 659 F.2d 91, 93 (8th Cir.1981). Here Gill has not submitted evidence showing even a prima facie case on that score—circumstances that would give rise to an inference of race discrimination. *Mason,* 704 F.2d at 365. Each of Gills' earlier-stated contentions will be examined in turn.

### 1. *Disparate Treatment*

■ Gill first argues he was disciplined differently from three other employees—all of them white. But such "disparate treatment" is probative of discrimination only if the other employees were situated similarly to Gill. *Donaldson v. Taylor Products Division of Tecumseh Products Co.,* 620 F.2d 155, 159 (7th Cir.1980). For that purpose courts focus on the similarity of the misconduct and of the employees' work records. *Meyer v. California and Hawaiian Sugar Co.,* 662 F.2d 637, 640 (9th Cir. 1981); *Aquamina v. Eastern Airlines, Inc.,* 644 F.2d 506, 508 (5th Cir.1981); *Otis v. Inland Container Corp.,* 25 FEP Cases 1280, 1282 (N.D.Ill.1981).

■ Plainly each of the three employees Gill points to as receiving less discipline was not situated similarly to Gill:

1. Edward Karris carelessly produced some defective products on the punch machine he operated. He was given an oral warning and was later removed from that job when he again punched out some defective products (Westinghouse Ans. to Int. 5 of Gill's First Set of Interrogatories).[5] Defective workmanship is not sufficiently comparable to all the circumstances of Gill's incident as to make the two employees "similarly situated."

2. Two other employees who had industrial jeep accidents were not disciplined at all, but those employees were also not situated similarly to Gill:

(a) George McNamara ran into a foundation support in an aisle but caused no damage to either the jeep or the structure. He had no history of prior accidents while operating an industrial jeep. (W. Ans. Int. 1–6).

(b) Angelo Pagan struck the leg of another employee who was carelessly walking backward into the aisle. Pagan was not disciplined because the accident was really caused by the struck employee and Pagan had no history of prior accidents while operating an industrial jeep (W. Ans. Int. 1–4).

In contrast Gill (1) had a prior accident with an industrial jeep as well as numerous other warnings concerning poor performance in his work record, (2) was solely responsible for this accident and (3) caused damage to the property.

Such qualitative differences in the employees' misconduct and work records conclusively show Gill is not situated similarly to the other employees. Thus the imposition of a greater disciplinary sanction on Gill is not probative of racial animus.

### 2. *Racism.*

■ Gill's unsupported claim that certain supervisors were "racists" is not evidence of race discrimination. Gill provided no factual support whatever for his charges, instead offering conclusory statements as

---

5. For convenience such answers are hereafter cited "W. Ans. Int. —", followed by the number of the interrogatory set, then by the number of the interrogatory within that set—thus in this instance "W. Ans. Int. 1–5."

to what he thought the supervisors' attitudes were (Dep. Tr. 111–29). Those things are simply not enough to create even a reasonable inference that racial animus motivated imposition of the two-week suspension.

### 3. *Other Claims*

Gill also has not shown how any of the other facts he points to support an inference of race discrimination. They need only brief discussion.

First, Gill makes much of the fact employees' Rules of Conduct Category B[6] does not expressly provide for two-week suspension. But Category B does provide:

> The following actions by an employee are considered as serious misconduct, and the disciplinary penalty for the first such action is three days off without pay. A second act of misconduct in the group of actions listed below—whether it's a repetition of the first action or is another action in this group—will result in release.

And Gill was a Category B *second* offender. Westinghouse's interrogatory answers said its policy is not to discharge an employee for a second offense until there has been sufficient time to investigate. Suspension pending investigation gives Westinghouse an opportunity to investigate the misconduct and the employee's work record and decide on the appropriate discipline (W. Ans. Int. 2–2). Gill has come forward with no evidence to show that policy is a prohibited practice[7] or a practice followed only with minority personnel.

■ Second, Gill points to the absence of any written notice of the reasons for the discipline imposed on him. But Gill had actual notice of the action taken and the reasons therefor on both December 3 and 17. Nor has he offered any evidence that would show such written notice is given earlier to non-minority employees or is re-

quired by either the collective bargaining agreement or the practice of the workplace.

Finally, Gill asserts Westinghouse gave different reasons for his suspension in the written notice than in W. Ans. Int. 2–2. That contention is not well taken.

Westinghouse said in the notice (reproduced verbatim, including minor errors):

> Employe damaged an electrically operated truck-well door when he struck it with an industrial truck. After pushing the button to raise the door, the employe had got on the truck and proceded forward before the door was clear of the truck. Management determined the employe's actions to be negligent and he was indefinitely suspended in line with is previous desciplinary actions and most recent misconduct.

> The Union officials contacted Management several times while the employe was on suspension to discourage a final action of discharge. The Union had stated the employe had used bad judgment but felt discharge to be too severe and wished Management to cooperate with them by taking a less harsh disciplinary action. During a meeting on 12–17–82 with the employe and his union representatives, Management expressed its willingness to cooperate with the Union. However, Management could not tolerate the employe's past poor conduct and would require a commitment from the employe of a 100% work effort and cooperation with the understanding that any further misconduct would result in discharge. The employe stated he could and would commit himself to such conditions. The employe was returned to work the same day, 12–17–82.

Its interrogatory answer clarifies what was meant by Gill's "recent misconduct" and "past poor conduct." Westinghouse did not rely only on occasions where formal discipline resulted, but considered Gill's entire employment record (W. Ans. Int. 2–3).

---

**6.** Westinghouse acknowledges Gill was disciplined under that category (W. Ans. Int. 3–2).

**7.** In fact W. Ans. Int. 3–5 stated indefinite suspension pending investigation is proscribed neither by the collective bargaining agreement nor by the Rules of Conduct.

Furthermore, Westinghouse is not precluded from considering warnings and reprimands more than one year old (W. Ans. Int. 3–6).

In short, Gill has not shown a discrepancy in fact between the notice and Westinghouse's interrogatory answers. And even if such a discrepancy had existed, Gill has not even hinted at how that would raise an inference of *race* discrimination.

\* \* \*

All Gill's contentions have failed to raise a prima facie case. That is really the end of the matter. But even supposing it were otherwise, Westinghouse must still prevail. Westinghouse has articulated legitimate reasons for Gill's suspension. Nothing Gill offers raises a fact issue to create any inference those reasons are pretextual. *Mason,* 704 F.2d at 366.

### Conclusion

There is no genuine issue of material fact, and Westinghouse is entitled to a judgment as a matter of law. Its motion for summary judgment is granted, and this action is dismissed with prejudice.