Frank OGLESBY, Plaintiff,

v.

COCA–COLA BOTTLING COMPANY OF CHICAGO/WISCONSIN, Defendant.

No. 83 C 9372.

United States District Court, N.D. Illinois, E.D.

Oct. 28, 1985.

Joseph N. Armstrong, Chicago, Ill., for plaintiff.

Douglas A. Darch, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Frank Oglesby ("Oglesby") sues his former employer, Coca-Cola Bottling Company of Chicago/Wisconsin ("Coca-Cola"), under 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 629–634 ("ADEA").[1] Oglesby asserts Coca-Cola discriminated against him on the basis of his race (black) and his age (45) by harassing him on the job and ultimately forcing him to resign.

Coca-Cola has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, its motion is granted.

### Facts [2]

In November 1975 Coca-Cola hired Oglesby (then 38) as an account manager at its Alsip, Illinois division ("Alsip"). Oglesby held an associate's degree in business administration from Kennedy-King College (1970) and had done further course work in business, marketing and accounting at Governor's State University without taking a degree (Oglesby Dep. [hereafter simply "Dep."] 3–4).[3] In early 1979 Oglesby was promoted to the position of route manager.

Alsip served as a sales and distribution center for Coca-Cola soft drinks (Coca-Cola, Tab, Sprite, Fresca and Mello Yello, Dep. 42) in the southern part of Chicago and the south suburbs. Actual sales of the products were effected by the drivers who left Alsip in the morning with loaded trucks to serve their regular assigned routes. Each route manager (such as Oglesby) supervised four or five routes and reported in turn to a region manager, each of whom supervised up to five route managers. At the top of the pyramid was the vice president of sales.

During most of Oglesby's tenure as a route manager, Duane Hallstrom ("Hallstrom") was vice president of sales and Ed Jancauskas ("Jancauskas"), a white male four years Oglesby's junior, was Oglesby's region manager (P.Int. 8(c) supp. response). In mid-October 1982 Jancauskas was transferred to another Coca-Cola division and Octavus Morgan ("Morgan"), a black male 15 years Oglesby's junior, was brought in to replace him (Morgan Dep. 81; Hallstrom Dep. 174; P.Int. 8(c) supp. response). Morgan had been a region manager at Coca-Cola's Niles, Illinois division immediately before the transfer (Morgan Dep. 5). Hallstrom chose him over a white candidate because (Hallstrom Dep. 177):

He was the better choice. He was familiar with the territory. He was black and I served [sic—should be "surveyed"?] the territory and I thought Morgan would be better for the area I had served [sic].

Morgan had direct supervision over four people: Oglesby; Ramsey Fouda ("Fouda"),[4] a male one year Oglesby's junior; Vic Pernice ("Pernice"), a white male four

---

**1.** All citations to Title VII and ADEA will simply take the form "Section—," with numerical references to Title 42 (as to Title VII) or Title 29 (as to ADEA), rather than to either statute's internal numbering. Because the statutes' numbers are so different, no confusion should be occasioned by that usage.

**2.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable infer-ences in the light most favorable to the nonmov-ant—here, Oglesby. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of facts adhere to those principles.

**3.** Aside from his 1955–59 tour of duty in the Marine Corps (Dep. 6), the record is silent as to Oglesby's prior job experience.

**4.** Coca-Cola listed Fouda as "O" (Oriental) on its list of employees by race (P.Int. 6(a) supp. response). Morgan described him as an Egyptian (Morgan Dep. 42).

years Oglesby's senior; and Rod Roberson ("Roberson"), a black male 21 years Oglesby's junior with a four-year college business degree (Dep. 157). Oglesby, Fouda and Pernice were route managers, while Roberson was a marketing development manager (Morgan Dep. 10–11).

Oglesby had a substantial history of unsatisfactory performance before Morgan arrived on the scene at Alsip. Less than four months after that arrival and after "numerous conversations" with Oglesby (Morgan Dep. 81),[5] Morgan determined Oglesby was not a satisfactory employee and decided to terminate him. Morgan spoke to Hallstrom at about 8 a.m. January 25, 1983 to "bring[ ] him on board as far as my feeling about Frank's performance" (Morgan Dep. 83). Hallstrom backed up Morgan's decision "as far as the termination" (Morgan Dep. 84).[6]

Hallstrom had his secretary type up a letter of resignation for Oglesby to sign (Hallstrom Dep. 180). He also prepared a "statement from Frank Oglesby and his acceptance of the severance program, his acceptance of the several packages in turn for his resignation" (Hallstrom Dep. 181). That statement, dictated to Hallstrom by Coca-Cola's personnel director (Hallstrom Dep. 181–82), called for:

1.  Salary continuous [sic] through February 15, 1983.

2.  Payment of three weeks' vacation pay which represents my 1983 vacation.

3.  Employees benefit coverage through March 31, 1983.

In addition the statement recited (the "Release"):

In exchange for the above, I hereby release Coca-Cola Bottling Company of Chicago and all owners, officers and employees of the Company, referred to herein from any claim now and in the future with respect to employee benefits, insurance, salary or any other claim related to employment.

Events came to a head late that afternoon. Morgan called Oglesby into Hallstrom's office at about 4 p.m. and told him his deficiencies as an employee had led Morgan "to the conclusion at that point that he cease his employment with the company as a route manager" (Morgan Dep. 89). According to Morgan and Hallstrom—who joined the meeting—Oglesby was offered the option to "sign [the resignation and Release] or resist" (Morgan Dep. 108). He was told if he did not sign "he would be terminated and he had the option to determine which route he wanted to take" (Morgan Dep. 108).

It is undisputed that there was virtually no discussion. According to Hallstrom, Oglesby simply said, "Okay, I will resign" (Hallstrom Dep. 179). Oglesby claims he was so enraged by the proceedings that he was "at a complete blank" (Dep. 139). He did not read the papers (Dep. 141):

I was in such a rage that they asked me to resign, I just signed a bunch of papers. I just wanted to get out of there since they asked me. I was so mad so I don't realize what I did.

Roberson ultimately took over Oglesby's position.[7]

Oglesby charges he was a victim of race and age discrimination manifesting itself through harassment (beginning in mid-1982) and ultimately his termination.

---

5.  At his deposition Morgan estimated he had talked to Oglesby about his performance approximately twice a week for four months (Morgan Dep. 80), although Oglesby actually worked under him for just over three months (mid-October 1982 to January 25, 1983).

6.  Morgan said the decision to terminate an employee did not require Hallstrom's approval, but in any event Hallstrom had never disagreed with Morgan's decision to terminate anyone (Morgan Dep. 16).

7.  It will be recalled Roberson was a marketing development manager already reporting to Morgan. Hallstrom labeled Roberson as Oglesby's "replacement" (Hallstrom Dep. 124), but Coca-Cola's P.Int. 8(c) supp. response shows Roberson was not placed as a route manager until April 15, 1983 (some seven weeks after Oglesby left Alsip). Nothing in the record indicates who, if anyone, acted as manager of Oglesby's former routes in the interim.

Oglesby's testimony identified 10 separate forms of alleged harassment:

1. He was required to return to the office from the field earlier in the day than other route managers (Dep. 62).

2. He received complaints from his supervisor (Jancauskas) that his reports were overdue (Dep. 64).

3. He was assigned a "raggedy van" to drive, while other route managers got new vans (Dep. 65).

4. He was required at least once to drive a delivery truck when one of his route drivers was absent, a job "the other people didn't have to do" (Dep. 66).

5. He was told not to drink alcohol while on the job, though his bosses occasionally drank alcohol during working hours (Dep. 71). He stopped drinking during work hours when asked to do so, but he felt harassed by "the way it was put to me" (Dep. 72).

6. He was "written up" for failing to have his key account book[8] up to date, though stores on his routes were being boycotted and thus would not stock Coca-Cola products (Dep. 75–76).[9]

7. He was "picked on" for failing to collect a past-due account, even though the account had not originally been on one of his routes and had only recently been shifted into his district (Dep. 84–85).

8. He was occasionally required by Jancauskas to wear a driver's uniform while in the field, though other route managers were not similarly required to do so (Dep. 85–86).

9. He received a written complaint from Jancauskas for allowing three drivers on the due bill[10] to take their trucks out for deliveries, though he thought he had an oral agreement with Jancauskas that the drivers would be permitted to drive (Dep. 88).

10. He received complaints that he had "no control over [his] men" and that his men were not doing their jobs properly out on the street (Dep. 97), although the boycott had made it difficult to get the stores to stock any Coca-Cola products—much less the full product line.

In each instance Oglesby claims he was the only route manager who was so treated.

Early in October 1982—before he came under Morgan's supervision—Oglesby took his grievance of harassment to the Equal Employment Opportunity Commission ("EEOC") Chicago office. He had an interview with a Ms. Jackson, who filled out a charge form containing Oglesby's allegations of harassment (Dep. 58). Under the heading "CAUSE OF DISCRIMINATION BASED ON MY (check appropriate box(es))" the box for "RACE" was checked, and in the body of the complaint Oglesby stated (Dep.Ex. 10):

---

**8.** According to Oglesby, a route manager's key account book was supposed to show, for the important retail outlets (Dep. 78):

> [w]hat was on the shelf, what was the distribution, how many racks were in place, how many coolers were in the store and things of that nature, anything that pertained to Coca-Cola.

**9.** During the first part of 1982 Operation PUSH, a Chicago-based political, economic and educational action organization, sponsored a "withdrawal campaign within the black community" against Coca-Cola (Jancauskas Dep.Ex. 25). Just when the boycott began is not shown in the record, but it was apparently well under way by mid-April 1982 (Jancauskas Dep.Ex. 24) and it ended July 26, 1982 (Jancauskas Dep.Ex. 25).

**10.** That term describes a driver whose cash receipts are less than the amount of product re-moved from his truck (Dep. 23). Company policy as to the eligibility of drivers on the due bill to continue working before making good on the cash deficit is something of a bone of contention between the parties. Oglesby acknowledged the company policy that a driver could not work until he had paid off his arrears (Dep. 27), but Oglesby said he had a degree of discretion as to whether to allow a driver under his supervision to work, even without the approval of his own supervisor (Dep. 28). Jancauskas said a route manager was not permitted to make that decision unilaterally and must come to him for approval—which might be oral (Jancauskas Dep. 43). This Court need not resolve the issue for purposes of the present motion, for the incident described in the text does not concern general company policy but rather a dispute over whether Jancauskas had in fact—as Oglesby claims—agreed to extend the drivers' time to pay their arrears.

I believe I have been discriminated against because of my race, Black in that....

Oglesby's charge was not filed in October 1982. Instead it was signed by Oglesby and dated March 29, 1983, and it is date-stamped as received by EEOC April 5.[11] Along with the charge, Oglesby sent a handwritten two-page letter (the "Letter") to "update" Ms. Jackson as to events since the charge was written up, including his termination.[12] Oglesby received an EEOC Notice of Right To Sue September 30, 1983 and filed this suit 82 days later.

### Preliminary Issues

At the outset Coca-Cola raises two questions potentially dispositive of this action in whole or in part:

1. It urges the Release executed by Oglesby at the time of his resignation bars this action in its entirety as a matter of law.

2. It asserts the jurisdictional requirements for an ADEA action have not been met, requiring dismissal of the age discrimination claim.

It is wrong on both counts.

### 1. Release

There appears to be no general public-policy bar to negotiated releases of employment-discrimination claims. "[P]resumably an employee may waive his cause of action under Title VII as part of a voluntary settlement...." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974); see *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 860–62 (5th Cir.1975). Oglesby therefore does not argue the Release is per se invalid. Rather he says the

waiver is ineffective because neither knowing nor voluntary. *Alexander*, 415 U.S. at 52 n. 15, 94 S.Ct. at 1021 n. 15.

Oglesby's first line of attack is that the Release is ambiguous, so he cannot be said to have known precisely what rights he was surrendering when he signed. Coca-Cola in turn seeks to sever the last clause ("any other claim related to employment") from the Release and construe it as an unambiguous "general release" (R.Mem. 2–3). But when placed in the context of the preceding clause, the claimed generality of the Release is not so clear: "any claim ... with respect to employee benefits, insurance, salary or any other claim related to employment" may well be read as a release of claims limited to the types of emoluments of employment to which an employee is normally entitled—"employee benefits, insurance, salary" being examples of such emoluments—but not of claims related to allegedly illegal activity by the employer. That would be a classic illustration of the *ejusdem generis* principle. *United States v. LaBrecque*, 419 F.Supp. 430, 434 (D.N.J.1976) ("The maxim, *ejusdem generis*, limits general terms ... which follow specific terms ... to matters similar to those so specified").

Contrary to Coca-Cola's assertion, nowhere on its face is the Release characterized as a "general release," nor is it phrased as such releases normally read. Its language may fairly be contrasted with the typical general-release terminology in one of the cases relied upon by Coca-Cola: "any and all manner of actions, cause or causes of actions ... [or] claims ... whatsoever at law or in equity...." *Green v. Valve Corp. of America*, 428 F.2d 342, 345

---

**11.** It seems plain the charge was filled out early in October 1982, as the last item referred to in the charge was a September 16, 1982 write-up from Jancauskas, and there was no mention of Morgan (who became Oglesby's supervisor in mid-October 1982) or of Oglesby's January 1983 termination. Oglesby testified he received a letter from EEOC telling him he must sign the charge and send it back in, although he was unclear as to the date of that letter (Dep. 104–05).

**12.** Oglesby attached a photocopy of the Letter, dated 3–29–83 and date-stamped by EEOC April 5, 1983, to his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. As Coca-Cola R.Mem. 5–6 points out, the Letter has not been authenticated. This opinion later discusses the significance of that nonauthentication and of the Letter's mention of an age factor (as to which the original charge form had been silent).

(7th Cir.1970) (emphasis, and a substantial amount of other sweeping verbiage, omitted); see also *Pilon v. University of Minnesota*, 710 F.2d 466, 467 (8th Cir.1983) (upholding against a Title VII claim a release of "any and all manner of actions, suits, claims, damages, judgments, levies, and executions, whether known or unknown, ... which Elaine Pilon ever had ... against these parties from any act or thing occurring prior to the date of the execution of this document ..."). Clearly the language of Coca-Cola's release does not begin to approach the breadth of those in *Green* and *Pilon* (each of which involved a classic example of the true "general" release).

Yet any holding that Oglesby had no adequate knowledge of what he was releasing must not rest on the words of the Release alone. As this Court put it in *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 568 F.Supp. 1096, 1101 (N.D.Ill.1983):

> It is well established a general release is valid as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry.

Whether or not the "general release" label is the right one to attach to the Release, the real question is what the document was intended to embrace. On that score it would be disingenuous for Oglesby to assert he had no knowledge of his potential employment discrimination claims when he was asked to sign the Release. Indeed the fact he had gone to EEOC in October 1982 reflects his concern for his statutory rights well before the date of his termination (see Dep. 60–61), though his not having actually filed a complaint by then might indicate he was not sure of the validity or strength of his claim.

*Knowledge* of a potential claim, however, is not the issue. What does control is what the Release was *intended* to cover (intent being determined in the manner familiar to all contract disputes) in the light of such knowledge, and what it could *validly* cover (validity too being determined in contract

terms). After all it must not be forgotten the Release is a contract, even though executed in the context of a statutory employment discrimination claim, and its interpretation must be according to principles of contract law. See *Oberweis*, 568 F.Supp. at 1098 n. 5 (release of antitrust liability claim, in the context of a federal antitrust action, is nevertheless a contract governed by state law).

In that context Oglesby's first line of attack (the lack of any intent to release the claims now in issue, confirmed by the failure of the Release language unequivocally to cover such claims) meshes with his second line of attack (the lack of any such intent because vitiated by duress). In the latter respect Oglesby urges the Release must be voided under contractual principles of duress because it was presented to him on a take-it-or-leave-it basis, with no prior negotiation or opportunity to discuss the terms with an attorney. According to both Morgan and Hallstrom, the Release was prepared in advance for Oglesby's signature and the papers were presented to him in terms of "sign or resist." He was given the choice to sign or be fired, and although Morgan and Hallstrom said they explained the Release entitled him to certain benefits (Morgan Dep. 108; Hallstrom Dep. 179), there was apparently no discussion of what Oglesby would be giving up or any opportunity offered to adjust the terms of the deal.

That factual matrix is a far cry from the situation in *LaBeach v. Beatrice Foods Co.*, 461 F.Supp. 152, 158 (S.D.N.Y.1978), relied upon by Coca-Cola, where the court observed the employee "did not execute the release until after he had deliberately and carefully prepared for the ... settlement meeting" resulting in his release of claims for a substantial payment in cash. Nor is Oglesby's situation comparable to that in *Pilon*, 710 F.2d at 468, where the employee who released her Title VII claims negotiated the precise terms of the release while represented by her attorney (in *LaBeach* the employee had similarly consulted with his lawyer in preparing for the settlement

meeting, though the lawyer was not at the meeting itself).

█ Of course negotiation of terms through counsel is not the sine qua non of a valid contract. But in this case that factor might have mitigated the evident potential for duress. Illinois recognizes the rule that "threatened acts of a party may constitute duress where their undoubted effort was to undermine the ability of another to refuse to execute an agreement." *Laemmar v. J. Walter Thompson Co.*, 435 F.2d 680, 682 (7th Cir.1970). Oglesby's "option" to "sign or resist," while not itself an illegal threat, might have been sufficient to "put[ ] the victim in such fear as to act against his will." *Kaplan v. Kaplan*, 25 Ill.2d 181, 185, 182 N.E.2d 706, 709 (1962). In particular "the threat of discharge from one's employment may constitute duress which would make voidable a contract executed while a party was under such a threat." *Laemmar*, 435 F.2d at 682. Certainly a factfinder might rationally find the threat of being fired traumatic, especially for a managerial employee of middle age. And as *Laemmar* teaches, a threat may amount to duress even though the employer is legally entitled to fire the employee. *Id.*

█ Most critically for current purposes, the existence vel non of duress under such circumstances must be a matter for the trier of fact. *Id.* That conclusion is buttressed by Oglesby's assertion he was in a state of "rage" during the entire interview, causing him to be "at a complete blank" (Dep. 139). And even apart from that factual issue, to return to Oglesby's first point, the ambiguities inherent in the language and factual context of the Release preclude any ruling as a matter of law as to the Release's intended coverage. Under the circumstances the question of contractual intent must likewise be for the trier of fact. *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976) (per curiam). For either or both of Oglesby's asserted reasons, then, the Release does not necessarily bar his claims.

### 2. Prerequisites to ADEA Action

Section 626(d) provides:

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission....

*Stearns v. Consolidated Management, Inc.*, 747 F.2d 1105, 1111 (7th Cir.1984) holds the Section 626(d) filing requirement is not jurisdictional (so as to permit sua sponte dismissal of an ADEA suit for lack of compliance), but it is a condition precedent to an ADEA suit that may be waived or equitably tolled. There has been no waiver by Coca-Cola, nor does Oglesby claim equitable tolling. Thus the question is simply whether Oglesby has "filed" an age discrimination claim.

It is conceded Oglesby did not check a box labeled "age discrimination" on his EEOC charge sheet, for no such specific box exists.[13] Nor did Oglesby's statement of particulars in the EEOC charge (Dep.Ex. 10) mention age discrimination or any facts that would imply it (even Oglesby's own age was not specified), so as to satisfy *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164, 168 (7th Cir.1976) (en banc).[14] Instead Oglesby points to the handwritten Letter, which he apparently included with his charge when he finally signed and sent it in.[15] Oglesby wrote in the Letter (reprinted verbatim

---

**13.** Under the heading "CAUSE OF DISCRIMINATION BASED ON MY (Check appropriate box(es))" there are boxes for "RACE," "COLOR," "SEX," "RELIGION," "NATIONAL ORIGIN" AND "OTHER (Specify)" (Dep.Ex. 10). Of course "age" would fall into the "other" category, but EEOC did not expressly specify to the unrepresented complainant that an age discrimination charge could be filed on the form. Neither party has addressed whether EEOC uses another form for ADEA charges.

**14.** *Jenkins* was a Title VII case, but there is no reason to believe its principles would not extend to filing under ADEA.

**15.** Each document bears the date stamp:

April 5 1:55 PM '83
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
CHICAGO DISTRICT OFFICE

here, except that the original was printed entirely in capitals):

> They have brought in new mgrs black Hispanic and white, this is still a cover up. It took most acct mgr five years to become district mgr. Yet they're bringing in young men and giving them these position in two week, cuting cost by dismissing mgr with more time due to coming salary increase.

■ Oglesby contends that is sufficient notice to EEOC of a claim based in part on age discrimination. So long as EEOC has actual notice of a complainant's age discrimination claim (even though the charge as written up makes no specific charge of such discrimination), he or she may bring suit under ADEA, *Holly v. City of Naperville*, 571 F.Supp. 668, 671–72 (N.D.Ill. 1983). EEOC filings are mandated not to satisfy any technical pleading requirement reminiscent of the old forms of action, but simply to give EEOC the opportunity to investigate the basis for the claim and to "encourag[e] informal conciliation and foster[ ] voluntary compliance" by the employer. *Brown v. Puget Sound Electrical Apprenticeship & Training Trust*, 732 F.2d 726, 730 (9th Cir.1984). Obviously EEOC cannot investigate or attempt to conciliate a charge of which it is not aware. But if it has actual notice, technical compliance with the format of its charge sheet—not a litigation complaint to be served on the employer, but just a source of information for EEOC to use in its investigation—may be convenient but is scarcely necessary. That is not a fair reading of "a charge ... filed with" EEOC for Section 626(d) purposes.

■ Coca-Cola's further argument—that the ADEA charge must be stricken because EEOC never in fact investigated the claim—is equally without merit. Coca-Cola is simply wrong in claiming *Clark v. Chrysler Corp.*, 673 F.2d 921, 931 (7th Cir.1982) requires actual EEOC investigation as a condition precedent to an ADEA suit. *Clark* treated lack of such investigation as an evidentiary indication that no claim of sex discrimination had in fact been brought to EEOC based on information supplied by the claimant. Here Oglesby relies on the Letter, not on EEOC's investigation, to show he made an age-discrimination claim. What controls is not what EEOC did but what it was given the opportunity to do. *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) teaches an age-discrimination complainant need do no more than file an EEOC charge and wait 60 days before bringing suit. See *Martinez v. United Automobile, Aerospace & Agricultural Implement Workers of America, Local 1373*, 772 F.2d 348, 351 (7th Cir.1985); see also *Babrocky v. Jewel Food Cos.*, 773 F.2d 857, 862, 866 (7th Cir.1985) (discussing the "utmost liberality" with which EEOC charges are to be construed).

Coca-Cola makes two further threshold contentions to bar the ADEA claim. Neither succeeds.

■ First Coca-Cola takes the unpersuasive tack that Oglesby's statements in the Letter cannot be construed to refer to age discrimination, addressing instead only relative seniority among employees. But the Letter refers to the "young men" being brought in to replace managers "with more time due...." While Oglesby does not explicitly say the young men are replacing older men, he clearly complains an influx of young men has caused him trouble. No exercise of EEOC imagination would be required to read that and recognize a potential age discrimination problem.

■ Second, Coca-Cola asserts (1) the Letter is unauthenticated and therefore inadmissible under Fed.R.Evid. 901, so (2) it fails the Rule 56 test permitting consideration of "any material that would be admissible or usable at trial." 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 2721, at 40 (1983). At the outset it should be noted Oglesby does not offer the Letter as hearsay to prove the truth of what it asserts: Coca-Cola's having engaged in age discrimination. Rather he seeks only to show EEOC received notice of his age discrimination claim.

Where documentary exhibits are presented by a Rule 56 movant to establish the absence of any disputed issue of fact, our

Court of Appeals has required they bear the earmarks of "reliability and trustworthiness." *Bracey v. Herringa*, 466 F.2d 702, 704–05 (7th Cir.1972). If this Court were faced with a hearsay problem and the Letter contained matter outside any recognized hearsay exception, that matter could not be considered on a Rule 56 motion even on behalf of the nonmovant. *Pfeil v. Rogers*, 757 F.2d 850, 860–61 (7th Cir.1985).

■ Here the Letter bears EEOC's date stamp, identical in form, date and time to the date stamp on the charge sheet itself (see n. 15). That gives "at least ... a prima facie aura of reliability" justifying this Court's reliance, absent "specific objections" from Coca-Cola. *Olympic Insurance Co. v. H.D. Harrison, Inc.*, 418 F.2d 669, 670 (5th Cir.1969) (IBM printouts made in regular course of business may be considered on Rule 56 motion absent specific objections to their reliability). Coca-Cola argues not that the Letter *cannot* be authenticated for the purpose of showing EEOC receipt, but only that it *has not yet* been authenticated. Nothing about the stamp or the Letter gives pause in that respect.

Moreover Coca-Cola itself relies on the authenticity of the date stamp on the charge sheet in support of *its* argument as to what was filed with EEOC.[16] It cannot have it both ways. This Court would commit an injustice by granting Coca-Cola summary judgment in Oglesby's ADEA claim due to such an easily-remedied flaw, and it declines to do so.

*Oglesby's Claims of Discrimination*

This opinion turns at last to the substantive merits. Both sides have engaged in extensive—and at times contentious—discovery. Neither side has been wholly candid in his or its exposition of the facts in the briefs, and Oglesby has failed to comply with this District Court's General Rule 12(f) (requiring him to controvert Coca-Cola's Statement of Uncontested Material

Facts). All that has made this Court's (and before that its law clerk's) task more difficult but (as the following discussion reflects) still manageable.

Section 623(a)(1) provides:

It shall be unlawful for an employer—

(1) to ... discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . .

That "because of ... age" requirement is a proximate cause concept—what *Golomb v. Prudential Insurance Co. of America*, 688 F.2d 547, 552 n. 2 (7th Cir.1982) (emphasis in original) defines as age being "*a determining factor*" in the employee's discharge or other adverse employment action. As *Parker v. Federal National Mortgage Association*, 741 F.2d 975, 978 (7th Cir.1984) said:

[A]n employer does not violate the ADEA merely by discharging an employee whose age falls within the protected category.

Like most other courts, our Court of Appeals has adopted for ADEA purposes (see *Golomb*, 688 F.2d at 551) the Title VII three-step approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981):

1. Plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence.

2. Defendant must then articulate a legitimate, nondiscriminatory reason for the adverse action.

3. If defendant carries that burden, plaintiff must then show by a preponderance of the evidence that the proffered reason or reasons amounted to a pretext for discrimination.

---

**16.** Oglesby's identification of the charge at his deposition was not authentication of the receipt stamp. Authentication of a document for one purpose—its genuineness as a product of Oglesby's statements—is not necessarily authentication for another—its receipt by EEOC.

Those shifting burdens relate to production only, with the burden of persuasion always remaining on the employee (*Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). Of course the Rule 56 context requires the employee only to demonstrate the existence of a material fact issue, not to carry the day entirely.

There is no hard-and-fast rule as to how a prima facie ADEA case must be made. Direct evidence, such as an employer's statement about wanting to get rid of older employees and to replace them with younger ones, will of course suffice. *Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985). Absent such direct evidence, a prima facie case may be established when a plaintiff shows (*id.* at 96):

> (1) he was a member of the protected class (persons aged 40 to 70); (2) he was qualified for his position; (3) he was terminated; and (4) he was replaced in his position by a younger person.

Title VII's Section 2000e–2 prohibits discrimination "because of ... race, color, religion, sex, or national origin" on the same terms as ADEA. Finally Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

It requires purposeful discrimination on the basis of race. *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982). As with Title VII and ADEA, under Section 1981 "the basic inquiry is the same: Was [plaintiff] suspended for an impermissible reason of racial animus?" *Gill v. Westinghouse Electric Corp.,* 594 F.Supp. 48, 51 (N.D.Ill.1984).

Given the identity of the burden of proof involved, there is no need to go into Oglesby's claims of race and age discrimination separately. Oglesby has not made out a prima facie case as to either.

Because Oglesby was a 45-year-old Black man, he was within the protected classes of race and age, and he admittedly suffered an adverse employment action.[17] See *Stumph,* 770 F.2d at 96. But Coca-Cola says Oglesby was not qualified for his position because the undisputed facts show he was not performing up to Coca-Cola's expectations: His communications with his salesmen were poor (Morgan Dep. 22); he did not call on all of his "key accounts" even once a month, though twice a month was the requirement (Morgan Dep. 33, 41); he did not ride his routes at least twice a week as required (Morgan Dep. 53–54); he did not see that "corporate standards" were maintained in the stores on his routes (Morgan Dep. 56); he did not keep his supervisor fully informed of competitors' activities in the marketplace as required (Morgan Dep. 105); and he allowed deliveries to be made on a charge basis to a store not approved for credit purchases (Morgan Dep. 102). In addition he produced the lowest gross profit of any route manager at Alsip in 1982 (P.Int. 4(a)).

Oglesby first urges those complaints about his performance are not relevant to his prima facie case. As he points out, Coca-Cola responded to P.Int. 3(c) ("State why the Plaintiff in January of 1983 did not have the necessary qualifications, and state what qualifications he lacked") by stating, "Plaintiff did not lack the necessary qualifications." Oglesby thus would have it he also met the second *Stumph* factor: "He was qualified for his position."

That is no more than a semantic quibble. Coca-Cola does concede Oglesby

---

**17.** Coca-Cola does not argue Oglesby's leaving his employment, while technically a resignation, was not a "termination" within the meaning of the ADEA. Indeed Coca Cola's "Statement of Uncontested Material Facts" (D.Mem. 3) twice describes Oglesby's departure as a "termi-

nation." Oglesby may have been given some choice as to the form of his termination, but there can be no doubt of Coca-Cola's intent to cut off his employment as of January 25, 1983 regardless of Oglesby's response to its offers.

was "qualified" for his job in the limited sense he had the prerequisite qualifications to be hired into that job. In view of his having been a route manager for about four years at the time of his termination, it could hardly be said he was not "qualified" in that sense. But to be "qualified" for purposes of establishing a prima facie case, an employee such as Oglesby must show he "was performing his job at a level that met his employer's legitimate expectations." *Huhn v. Koehring Co.*, 718 F.2d 239, 243 (7th Cir.1983) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)). See also *Mason v. Pierce*, 774 F.2d 825, 827–29 (7th Cir.1985) (upholding summary judgment against Title VII claimant whose affidavit did not show she met her employer's legitimate job performance expectations; she did not show she was "qualified" for her job and thus did not make out a prima facie case of race discrimination).[18]

Thus Oglesby's prima facie case must in part show he was "doing what his employer wanted him to do." *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980) (per curiam). Of course the employer may not make unreasonable demands upon an employee in order to allege dissatisfaction. *Id.* But Oglesby's strenuous efforts to make out a case for the unreasonableness of Coca-Cola's requirements have not "set forth specific facts showing that there is a genuine issue for trial." *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983).

For the most part Oglesby has attempted to show sales volume was the most important component of a route manager's job, and at least during certain months his sales volume was quite good (Morgan Dep. 59–64). Morgan said sales ranked highest in importance among route managers' respon-

sibilities (Morgan Dep. 17), and Hallstrom rated sales as 85–90% of a route manager's goals (Hallstrom Dep. 45). But even if it were conceded that Oglesby was a top salesman (notwithstanding his bottom rank for the whole of 1982),[19] he cannot claim he met his employer's legitimate expectations by simply keeping up his sales. Coca-Cola unquestionably required other things as well, such as monitoring of delinquent accounts, reports on market activity, riding routes with drivers and filing timely written reports. As *Kephart*, 630 F.2d at 1223 teaches:

> The question before the court is not whether the company's methods were sound, or whether its dismissal of [plaintiff] was an error of business judgment. The question is whether he was discriminated against because of his age.

Oglesby cannot then (and in fairness, he does not) claim he met the business expectations of Coca-Cola. See *Mason*, at 829 (plaintiff's affidavit admitted errors and warnings but blamed others; that did not detract from entry of summary judgment against her). Instead he advances the position that other route managers were not called on to do what was required of him. If true, that would have double relevance:

1. If *no* other route managers were required to ride routes, monitor delinquent accounts and so on, that would tend to show the requirements applied to Oglesby were not "legitimate" or a genuine aspect of a route manager's job.

2. If no white or younger route managers were required to perform these tasks, that would tend to show Coca-Cola's rationale for dismissing him was pretextual.

Those arguments might well carry the day for Oglesby if only he could back them up. But after hundreds of pages of deposi-

---

**18.** Another way to show the purely semantic nature of Oglesby's contention is to assume arguendo Coca-Cola admitted Oglesby was "qualified" in a broader sense. Even so and if Coca-Cola then had to address the second-step burden, the existence of its job requirements and Oglesby's failures to meet them would be a legitimate nondiscriminatory reason to terminate Oglesby. And Oglesby would have the

comparable problem of proving those reasons pretextual.

**19.** Jancauskas Dep. 111 described Oglesby as "an excellent salesman ... a quality salesman.... [H]e did have it but he did not take advantage of it."

tion testimony and extensive documentary discovery, Oglesby has really produced no evidence other route managers were treated any differently than he. Though he claimed he was made to return to the office earlier in the afternoon than the other route managers, he could not "name names" of anyone given more latitude than he: "I don't know who's in, who's out" (Dep. 64). Though he complained he was being harassed by Jancauskas about late reports, he did not know if anyone else was allowed more time; in fact Jancauskas would tell everyone about due dates "at a mass meeting" (Dep. 65). Though he said he was made to drive a route truck when a driver was unavailable, he admitted other route managers also drove trucks if need be (Dep. 67–68). Though he claimed other employees drank on the job, he could not point to anyone else at route manager level or below who drank on the job unless at a sales meeting with a supervisor (Dep. 71–74).

In sum, Oglesby's "bare conclusory allegations" of disparate treatment are just the sort that fail to establish a genuine issue of material fact as to discrimination. *Parker v. Federal National Mortgage Association*, 567 F.Supp. 265, 270 (N.D.Ill. 1983), *aff'd*, 741 F.2d 975 (7th Cir.1984). Nothing in his evidence suggests the duties thrust on him were illegitimate or there was selective enforcement of standards.

On the contrary, Morgan testified Oglesby was the only one of his route managers who failed to visit key accounts as required and to ride routes regularly (Morgan Dep. 33, 41). Oglesby attempts to undercut that evidence by pointing to the statement of Donald Nash ("Nash"), who supervised Oglesby briefly at Alsip in 1981. Nash expressed the views that route riding was not terribly important and failure to ride

routes was not a basis for disciplining route managers (Nash Dep. 40). From the evidence, however, region managers such as Nash and Morgan have a great deal of latitude as to what they require of route managers under their supervision. Morgan could rationally have perceived route riding as a significant part of his management program, while Nash did not. And once again failure regularly to ride the routes was only one of Oglesby's flaws in Morgan's eyes.

In short, Oglesby's evidence, viewed most favorably to him, might at worst establish he was a victim of bad business judgment on his supervisor's part—or even of individualized persecution (though the latter would represent a real stretching of the facts). What is dispositive here is that none of the evidence reasonably creates the inference that the business judgment (or the less tenable "persecution") was based on Oglesby's race or his age.[20]

Oglesby raises another series of challenges to Coca-Cola's evaluation of his performance. He claims the PUSH boycott of Coca-Cola products during five months of 1982 affected his statistics disproportionally, because most of his accounts were in Black neighborhoods. Some doubt exists whether Oglesby's sales quota was adjusted to reflect the boycott: Hallstrom said it was (Hallstrom Dep. 206) while Nash said it wasn't (Nash Dep. 48).[21]

That entire issue is a red herring. Oglesby was fired by Morgan—who became his supervisor three months *after* the boycott ended—not so much because of Oglesby's sales performance, but for his failure to take care of other administrative duties required of him by Morgan. And even as to Oglesby's sales performance, he has offered no evidence of the extent to which any problems he had were a result of the

---

**20.** Oglesby's other assertions of mistreatment similarly fail to show any hint of racial or age-based animus. Thus he claims he was assigned a "raggedy van" while others drove new ones, but he does not show he was thus singled out among similarly situated route managers on the basis of race or age, nor does he even offer evidence of when such assignment of vans took place to permit tracing of the races and ages of

comparable personnel from the record. In the same way he states but does not support his assertion as to dress requirements.

**21.** Nash however did not supervise Oglesby during the time of the boycott. He left Alsip in January 1981 for another division (Nash Dep. 5).

boycott or (as Coca-Cola would have it) of his poor follow-through.[22]

Aside from his bare observation as to the existence of the boycott and the suggestion his poor performance should be laid at its door, Oglesby has tendered no facts in any way implying Morgan's decision to terminate him was related to impermissible considerations of race or age. As already said, the boycott was past history when Morgan came aboard. Oglesby has directed this Court to no overt statements of a discriminatory nature (cf. *Stumph*, 770 F.2d at 94), nor does he show facts from which this Court might infer a general atmosphere of disparate treatment of whites and blacks or of younger and older employees.

All of Oglesby's assertions that bear examination (and some that do not) have now been reviewed. It is plain he has not established a prima facie case in *McDonnell Douglas-Burdine* terms, for he has not shown he was "qualified" under the *Huhn-Kephart* standard.[23] And as pointed out earlier, even were this Court to allow Oglesby's foot into the door, the same arguments Coca-Cola advances to show he was not "qualified" would serve as an articulation of legitimate nondiscriminatory reasons for his termination. In those terms, Oglesby has wholly failed to show facts that would enable this Court even to infer a pretext. *Gill*, 594 F.Supp. at 53.

Whether under Title VII, ADEA or Section 1981, the analysis of Oglesby's complaint is the same: He has failed to show any facts indicating either race or age was a factor in Coca-Cola's actions. That entitles Coca-Cola to prevail on its Rule 56 motion.

### Conclusion

There is no genuine issue of material fact and Coca-Cola is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

■ Coca-Cola's request for attorneys' fees, however, is denied. Although Oglesby failed to make out a case, his claim was not objectively frivolous, and his positions were correct on Coca-Cola's strenuously urged issues as to the Release and the ADEA filing. Under the principles announced in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978), Coca-Cola thus is not entitled to attorneys' fees.

---

22. Two other route managers, DeCuir and Yockley, also served a primarily black clientele (Hallstrom Dep. 207), each of them serving under Nash in the Central division. Both of them did better by far than Oglesby in the 1982 profit standings: Yockley ranked 6th, DeCuir 11th and Oglesby 28th of 29 (Hallstrom Dep.Ex. 29). Yockley's age and race do not appear in the record; DeCuir was a black, 10 years older than Oglesby.

23. Although the depositions and interrogatories have laid bare a vast amount of raw data as to the race, age and sales performance of Coca-Cola's employees, Oglesby has not shown how it can be interpreted in his favor. Nothing suggests anyone who did not meet the job requirements imposed on Oglesby was retained. Route manager Ken Kwasny, a white male 21 years Oglesby's junior, was also discharged for poor performance early in 1983 (Hallstrom Dep. 186–87; P.Int. supp. response 6(a)). Similarly, nothing flows from the absence of disciplinary notices issued to white route managers for misconduct like Oglesby's (P.Mem. 14). Oglesby has not shown the prerequisite: the *existence* of such similar misconduct on the part of white managers, without their receiving such notices or other discipline. Cf. *Gill*, 594 F.Supp. at 51 (in disparate treatment case, qualitative differences in employee misconduct and work records shows they are not similarly situated for purposes of comparing disciplinary sanctions).